[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 23, 2004
THOMAS K. KAHN
CLERK

—————————————————

No. 03-13705
Non-Argument Calendar

—————————————————

D. C. Docket No. 02-00407-CV-TWT-1

RENEE S. PHILLIPS,

Plaintiff-Appellant,

versus

JO ANNE B. BARNHART,
Commissioner, Social Security Administration,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(January 23, 2004)**

Before ANDERSON, HULL and WILSON, Circuit Judges.

HULL, Circuit Judge:

Renee S. Phillips, through counsel, appeals the district court's order

affirming the Commissioner's denial of her application for social security disability insurance benefits under 42 U.S.C. § 405(g). After review, we vacate the district court's order and remand this case to the Commissioner for further consideration of Phillips's application for social security disability insurance benefits.

## I. BACKGROUND

The main issue on appeal is under what circumstances may an Administrative Law Judge ("ALJ") rely on the Medical Vocational Guidelines instead of a vocational expert. Because the ALJ's authority to rely on the Medical Vocational Guidelines instead of a vocational expert depends in part on the severity of Phillips's limitations, we first review Phillips's medical history.

A.      Phillips's Application

On October 27, 1998, Phillips applied for disability insurance benefits, alleging that she had been disabled and unable to work since July 31, 1997. Phillips claimed to be disabled due to fibromyalgia, chronic fatigue, cervical facet syndrome, irritable bowel syndrome, Sjögren's syndrome, bilateral sacroiliitis, a herniated disk, depression, mitral valve prolapse, and urinary tract infections.

On April 26, 2000, the ALJ conducted a hearing to determine Phillips's eligibility for disability insurance benefits. At the hearing, the ALJ heard

2

testimony from Phillips and reviewed extensive medical records covering Phillips's medical history from 1993 - 2000. We outline that evidence.

B.     Phillips's Testimony

At her hearing, Phillips testified that she was an unemployed, 45-year-old high school graduate, with one year of vocational training in secretarial science and business. Phillips further testified that she previously had worked for the State of Georgia for 18 years as a clerk, administrative assistant, administrator of the food and farm program, quality improvement coordinator, and director of community service programs.

According to Phillips, she left her position as director of community service programs in 1993 or 1994 due to exhaustion, headaches, muscle and body aches, and fatigue. Thereafter, she transferred to the office of quality control, where she worked until she retired due to her alleged disability in July 1997. Phillips stated that she did not consider taking another position that was less demanding with a state agency because she "didn't feel financially that there was any reason for that, to go backwards in [her] career." Phillips also surmised that taking a job with a reduced salary would affect her retirement benefits.

Phillips testified that her daily routine consisted of reading the paper, drinking coffee, watching the news, and doing things around the house such as

3

laundry and starting dinner. Additionally, she stated that she talked on the phone, shopped for groceries, went to the mall, painted sometimes, and had taken painting lessons. Phillips also stated that since she quit working, she had traveled by car to several destinations for leisure purposes in the southeastern United States. Phillips also flew to Mexico to attend her daughter's wedding. Finally, Phillips told the ALJ that she drove to the drug and grocery stores two to three times per week.

In addition to her other conditions, Phillips testified that she didn't manage anxiety very well and that she was "probably all the time moderately depressed." However, Phillips stated that her emotional condition was not disabling in and of itself, and that she could probably do a "very less, less stressful job that wasn't very physically demanding for a short period of time but probably not every day and certainly not all day every day." Phillips explained that stressful psychological or emotional situations caused her physical condition to worsen.

C.      Medical History From Treating Physicians

In 1993, Phillips began treatment with Dr. Sam Schatten, a rheumatologist. Phillips complained of: eye, mouth, and nail dryness; memory loss; itching; muscle pain; low energy; fatigue; trouble sleeping; easy bruising; and mitral valve prolapse. Dr. Schatten remained Phillips's primary treating physician through the time of her administrative hearing in this case.

Dr. William Whaley, a specialist in oncology and hematology, examined Phillips on July 13, 1995, and indicated that he thought Phillips had Sjögren's syndrome, mitral valve prolapse syndrome, multiple urinary tract infections, fibrocystic disease of the breast, and allergies. Dr. Whaley reported that "[t]he problem list looks a little long, but [Phillips] is basically a 40 year old completely and fundamentally healthy state employee."

On February 26, 1996, Phillips saw Dr. Olivia Mulligan, an endocrinologist, complaining of night sweats, muscle pain, irritability, and brief depression. However, all test results were normal.

On October 14, 1996, Phillips saw Dr. Amy Lang, a specialist in physical medicine and rehabilitation, complaining of constant neck and back pain that averaged 5 on a scale of 1 to 10 in intensity. Dr. Lang reported that the pain was beginning to interfere with Phillips's participation in social and recreational activities and completion of household chores and projects. Dr. Lang noted that Phillips demonstrated "multiple symmetric tender points above and below the diaphragm meeting the criteria for fibromyalgia syndrome." An October 26, 1996 radiology report indicated small to moderately sized disc herniation in two places on Phillips's cervical spine. The remainder of Phillips's spine appeared normal.

On December 30, 1996, Phillips's psychologist, Mary Melton, Ph.D.,

5

terminated treatment after six months, noting "major depression resolved." On an employer's form for disability retirement verification, Dr. Melton noted that Phillips's depression was not disabling, and that Phillips had been "successful in treatment for depression and in altering lifestyle to adjust for her chronic illness."

On December 31, 1996, Dr. Lang noted that Phillips's "left-sided neck pain is 'almost well.'" Dr. Lang's examination notes indicated that Phillips's cervical active range of motion was within normal limits with no pain reported. Dr. Lang diagnosed cervical facet syndrome (characterized by neck pain and a decrease in range of motion of the neck); regional myofascial pain syndrome of the neck and upper back; bilateral sacroiliitis (inflammation of the sacroiliac joint (located between the lumbar spine and the pelvis)); one centimeter right leg length discrepancy; depression, with noted intolerance of Paxil side effects; and Sjögren's syndrome, noted as stable. Dr. Lang provided Phillips with heel inserts to correct the leg discrepancy and to help Phillips's sacroiliitis. That same day, Dr. Lang wrote a separate report to an insurance provider, diagnosing fibromyalgia and cervical degenerative disease.[1]

On February 26, 1997, Dr. Lang noted that Phillips's stabilization exercises and stretching program had helped to decrease fibromyalgia symptoms and that her

---

[1]Dr. Alfonso Dampog, an anesthesiologist, treated Phillips with epidural steroid injections for her cervical facet syndrome on November 5 and 27, 1996, and January 14, 1997.

pain had been reduced to soreness. On May 28, 1997, Dr. Lang documented Phillips's problems as Sjögren's syndrome; fibromyalgia; cervical spondylosis (lesion of the spine of a degenerative nature); cervical facet syndrome; bilateral sacroiliitis; pes planus (flatfoot); one centimeter leg length discrepancy; and depression, noted as treated.

Dr. Lang noted that Phillips did not pursue cervical facet rhizotomy (surgical severance of spinal nerve roots to relieve pain), nor did Phillips fill the prescription for orthotics to correct the leg length discrepancy. Dr. Lang indicated that Phillips was planning to file for long-term disability due to inability to keep up with the pace at work. Dr. Lang wrote that virtually all activities of daily living aggravated Phillips's pain problems, and that she felt "overwhelmed by chronic pain and depression."

On June 25, 1997, Dr. Whaley evaluated Phillips and performed comprehensive laboratory and physical testing. Dr. Whaley described the issue as: "is she disabled by virtue of a medical condition such as hypothyroidism, lupus, collagen vascular disease, or is the disability psychiatric?" On July 16, 1997, Dr. Whaley documented normal test results and reported that "[w]e still don't know if she really is disabled or not but if she is disabled, it is certainly not from anemia, hypothyroidism, biochemical abnormality or lupus." Dr. Whaley noted that

Phillips was to be seen by Dr. Gene Abel, a psychiatrist, for evaluation and consultation.[2] Dr. Whaley also noted that Phillips had discontinued using Plaquenil, a drug used to manage the symptoms of Sjögren's syndrome.

On July 22, 1997, Dr. Susan Dreyer, a specialist in physical medicine, diagnosed chronic back and neck pain, secondary to fibromyalgia; remote history of disk herniation (stable); and history of depression. Dr. Dreyer emphasized the importance of aerobic exercise and stretching in treating fibromyalgia. Radiology reports from that day revealed that Phillips's lumbar spine was normally aligned and the interspaces were well maintained, with mild degenerative disc disease at one of Phillips's vertebrae.

On November 5, 1998, Dr. Schatten indicated that Phillips's exercise routine consisted of water aerobics 2-3 times weekly and walking one and a half miles four to five times per week. On December 21, 1998, Dr. Whaley wrote, Phillips is "much better now in exercise than she has been in prior years going 5 days a week, 2 sessions of water aerobics, 3 on a stationary bike, and some light weights for osteoporosis prevention."

A February 24, 1999, assessment of Phillips's psychological condition by Gary Bible, Ph.D., indicated that typical activities for Phillips included reading,

---

[2]There is nothing in the record to indicate Phillips ever saw Dr. Abel.

stretching and bending exercises, watching television, doing a small amount of chores, preparing dinner without difficulty, preparing sandwiches for lunch, eating out two or three times per week, visiting with a friend twice per week, talking on the phone, shopping for groceries twice a week, trips outside the home to do errands or visit friends two to three times per week, and occasional movies or trips to Florida. Dr. Bible's impression was that Phillips was "capable of functioning within any number of simple and minimally demanding work settings that would make allowances for her medical problems." He noted that Phillips appeared quite capable of understanding and carrying out simple instructions and handling social interactions, but that Phillips had mild impairments with regard to sustaining focused attention and task persistence.

On March 9, 1999, Phillips saw Dr. John Horney, a specialist in gastroenterology, for an assessment of her bowel condition that she indicated was a problem for approximately five years. Phillips described her symptoms as constipation alternating with diarrhea with some associated left lower quadrant pain. Dr. Horney diagnosed "[c]hange in bowel habits consistent with irritable bowel syndrome." A flexible sigmoidoscopy (a procedure in which a scope is used to view the colon) was normal.

Phillips saw Dr. Robert Cowles III in January of 1999 for recurrent urinary

9

tract infections. On April 19, 1999, Dr. Cowles reported that Phillips's "symptoms have completely resolved on the Macrobid suppression and she is not only asymptomatic but says she has not felt this well in many years."

On May 3, 1999, Dr. Schatten noted that Phillips had a runny nose and runny eyes, but that prior to the date of the exam, she "overall felt good" with "intermittent fatigue, depression, LBP [lower back pain], pain in hips, thighs, and knees." He noted further that Phillips had neck and trapezii pain with activity, but that the pain was less severe overall than before. Dr. Schatten assessed Phillips as having primary Sjögren's syndrome, stable; cervical myofascial pain syndrome, stable; urinary tract symptoms, treated well with drugs; osteoporosis; intermittent myalgias (pain in the muscles) of the lower back and lower extremities, exact etiology unclear; and allergic sinusitis.

In a functional capacities evaluation completed on January 24, 2000, Dr. Schatten reported that Phillips: (1) could work three hours in an eight-hour day; (2) could sit intermittently for up to 30 minutes; (3) could stand and walk up to 30 minutes; (4) had to lie down three to four times per day for 30 minutes to an hour at a time; (5) could never lift or carry more than ten pounds, and occasionally could lift or carry up to 10 pounds; (6) could use her hands and feet for repetitive actions; (7) could never crawl or climb; (8) could occasionally bend, squat, or reach; and

(9) had mild restrictions for activities involving unprotected heights and exposure to changes in climate, moderate restrictions for activities involving exposure to dust, fumes and gases, and no restrictions for activities involving moving machinery or driving automotive equipment. Dr. Schatten's medical rationale for the assessment was listed as: Sjögren's syndrome; fibromyalgia; myofascial pain; sleep disorder; cervical facet syndrome, including several surgeries; and frequent urinary tract infections.

D.     The Five-Step Process

Before we discuss the ALJ's decision in this case, we outline generally the five-step process the ALJ must follow in a social security disability case. In evaluating a claim for disability benefits, an ALJ must evaluate the claimant's case with respect to the following five criteria, as set forth in 20 C.F.R. § 404.1520:

1.     Is the individual performing substantial gainful activity;

2.     Does she have a severe impairment;

3.     Does she have a severe impairment that meets or equals an impairment specifically listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.     Can she perform her past relevant work; and

5.     Based on her age, education, and work experience, can she perform other work of the sort found in the national economy.

We discuss each step in greater detail below.

11

E.     Step One

At the first step, the ALJ must consider the claimant's current working situation. If the claimant is "doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled." 20 C.F.R. § 404.1520(a)(4)(i) & (b). If, however, the claimant is not currently "doing gainful activity" then the ALJ moves on to the second step.

In this case, the ALJ determined that Phillips "has not engaged in substantial gainful activity since July 31, 1997." Therefore, the ALJ concluded that Phillips satisfied the first step in the analysis described above. Accordingly, the ALJ moved on to the second step.

F.     Step Two

At the second step, the ALJ is to "consider the medical severity of [the claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). When considering the severity of the claimant's medical impairments, the ALJ must determine whether the impairments, alone or in combination, "significantly limit" the claimant's "physical or mental ability to do basic work skills." 20 C.F.R. § 404.1520(c). If the ALJ concludes that none of the claimant's impairments are medically severe, the ALJ is to conclude that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii) & (c). If, however, the ALJ concludes that the claimant's

12

impairments are medically severe, then the ALJ moves on to the third step.

As for the second step, the ALJ stated that Phillips "has Sjögren's syndrome and fibromyalgia, which I find to be 'severe' impairments."[3] Because Phillips had "severe" impairments, the ALJ went on to step three.

## G.    Step Three

At the third step, the ALJ again considers the "medical severity of [the claimant's] impairment(s)" in order to determine whether the claimant's impairment(s) "meets or equals" one of the listed disabilities. 20 C.F.R. § 404.1520(a)(4)(iii). Although the list is too voluminous to recite here, the idea is that the listings "streamline[] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." Bowen v. Yuckert, 482 U.S. 137, 153, 107 S. Ct. 2287, 2297 (1987). If the ALJ concludes that the claimant's impairments meet or equal one of the listed disabilities and meet the duration requirement, the ALJ will conclude that the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii) & (d). If, however, the ALJ concludes that the claimant's impairments do not meet or equal the listed impairments, then the ALJ will move on to step four.

---

[3]The ALJ, however, specifically concluded that Phillips's depression was not severe.

13

As for step three, the ALJ concluded that Phillips did "not have an impairment or combination of impairments listed in, or medically equal to one listed" in the regulations. Therefore, the ALJ moved on to step four.

H.    Step Four

At the fourth step, the ALJ must assess: (1) the claimant's residual functional capacity ("RFC"); and (2) the claimant's ability to return to her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). As for the claimant's RFC, the regulations define RFC as that which an individual is still able to do despite the limitations caused by his or her impairments. 20 C.F.R. § 404.1545(a). Moreover, the ALJ will "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence" in the case. 20 C.F.R. § 404.1520(e). Furthermore, the RFC determination is used both to determine whether the claimant: (1) can return to her past relevant work under the fourth step; and (2) can adjust to other work under the fifth step, discussed below. 20 C.F.R. § 404.1520(e).

If the claimant can return to her past relevant work, the ALJ will conclude that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv) & (f). If the claimant cannot return to her past relevant work, the ALJ moves on to step five.

14

In determining whether Phillips can return to her past relevant work, the ALJ must determine the claimant's RFC using all relevant medical and other evidence in the case. 20 C.F.R. § 404.1520(e). That is, the ALJ must determine if the claimant is limited to a particular work level. See 20 C.F.R. § 404.1567.[4] Once the ALJ assesses the claimant's RFC and determines that the claimant cannot return to her prior relevant work, the ALJ moves on to the fifth, and final, step.

As for step four, the ALJ assessed Phillips's RFC and concluded in this case: "I find that [Phillips] has the residual functional capacity (RFC) to perform the very limited demands of entry level work at the sedentary exertional level." The ALJ further stated: "I have limited [Phillips] to sedentary work based on her allegations of pain and fatigue and I have limited her to entry level work in light of her assertion that she can only handle one thing at a time to avoid stress."

In reaching her conclusion, the ALJ gave Dr. Schatten's "assessment [of Phillips] little evidentiary weight" because "his rather dire assessment [of Phillips] is in conflict with his [other] treatment notes, and [Phillips's] own testimony as to

---

[4]To determine the physical exertion requirements of different types of employment in the national economy, the Commissioner classifies jobs as sedentary, light, medium, heavy, and very heavy. These terms are all defined in the regulations. For example, sedentary work is defined by the federal regulations as work that "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567. The regulations also recognize that "[a]lthough a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Id. Each classification outlined above has its own set of criteria.

her daily activities." However, the ALJ also rejected "the findings of the DDS consultative physicians for light work."[5]

In this case, the ALJ specifically determined that Phillips could not return to "her past relevant work." However, the ALJ believed Phillips was "capable of much more than she suggests." The ALJ further stated that "while I realize that performing work (i.e. simple work) which is well below the level of her past work may be undesirable, both from a financial and job satisfaction perspective, she can nonetheless perform such work, and should have few difficulties doing so, given her wide range of daily activities." After concluding that Phillips had an RFC to perform sedentary work and that she could not return to her past relevant work, the ALJ moved on to step five.

I.   Step Five

At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v).[6] Essentially, the ALJ must determine

_____

[5]Light work is define as work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567. The regulations further state that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." Id.

[6]According to the regulations:
If [the ALJ] find[s] that you cannot do your past relevant work because you have a severe impairment(s) (or you do not have any past relevant work), [the ALJ] will

if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. If the claimant cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled.

There are two avenues by which the ALJ may determine whether the claimant has the ability to adjust to other work in the national economy. The first is by applying the Medical Vocational Guidelines.

Social Security regulations currently contain a special section called the Medical Vocational Guidelines. 20 C.F.R. pt. 404 subpt. P, app. 2. The Medical Vocational Guidelines ("grids") provide applicants with an alternate path to qualify for disability benefits when their impairments do not meet the requirements of the listed qualifying impairments. The grids provide for adjudicators to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each of these factors can independently limit the number of jobs realistically available to an individual.

---

consider the same residual functional capacity assessment [it] made under paragraph (e) of this section, together with your vocational factors (your age, education, and work experience) to determine if you can make an adjustment to other work. If you can make an adjustment to other work, [the ALJ] will find you not disabled. If you cannot, [the ALJ] will find you disabled.

20 C.F.R. § 404.1520(g)(1) (internal citation omitted).

Combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."

The other means by which the ALJ may determine whether the claimant has the ability to adjust to other work in the national economy is by the use of a vocational expert. A vocational expert is an expert on the kinds of jobs an individual can perform based on his or her capacity and impairments. When the ALJ uses a vocational expert, the ALJ will pose hypothetical question(s) to the vocational expert to establish whether someone with the limitations that the ALJ has previously determined that the claimant has will be able to secure employment in the national economy.[7]

Under step five, the ALJ used only the grids in Phillips's case and did not rely on a vocational expert. In so doing, the ALJ considered: (1) Phillips's RFC to perform entry-level sedentary work; (2) that Phillips was 45-years-old; (3) that Phillips had a high school application and one year of secretarial school; and (4) Phillips's prior work experience. The combination of these factors under the grids lead to the conclusion that Phillips was not disabled.

## II. DISCUSSION

---

[7]Should the ALJ find it necessary to consult a vocational expert, we note that "[i]n order for a VE's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999) (citing McSwain v. Bowen, 814 F.2d 617, 619-20 (11th Cir. 1987)).

18

Phillips appeals, arguing that the ALJ improperly rejected the medical conclusions of Dr. Schatten when determining Phillips's RFC. Phillips also argues that the ALJ was required to consult a vocational expert in this case.

A.    Treating Physician's Opinion

We first consider Phillips's argument that the ALJ erred when rejecting Dr. Schatten's opinion concerning Phillips's medical condition.[8] Because the ALJ articulated several legitimate reasons for giving less weight to Dr. Schatten's opinion, we readily conclude that the ALJ's determination that Dr. Schatten's opinion should be given little weight is supported by substantial evidence.

The opinion of a treating physician, such as Dr. Schatten, "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This Court has concluded "good cause" exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating

---

[8]Our review in a Social Security case is the same as that of the district court. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir.1990). "We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983). Rather, we must defer to the Commissioner's decision if it is supported by substantial evidence. Id. "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. (citing Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)). "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing Martin, 894 F.2d at 1529).

19

physician's opinion was conclusory or inconsistent with the doctor's own medical records. Id. When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons. Id.

In support of her decision to reject Dr. Schatten's opinion, the ALJ found that Dr. Schatten's assessment conflicted with his May 3, 1999 treatment notes and Phillips's own testimony regarding her daily activities. On May 3, 1999, Dr. Schatten documented that Phillips had a runny nose and runny eyes, but that prior to the date of the exam, she "overall felt good" with "intermittent fatigue, depression, LBP [lower back pain], [and] pain in hips, thighs, and knees." Dr. Schatten also noted that Phillips had neck and trapezii pain with activity, but that the pain was less severe overall than before.

Dr. Schatten's January 24, 2000 assessment, however, was very restrictive, indicating that Phillips could work three hours in an eight hour day, that she could sit intermittently for up to 30 minutes, that she could stand and walk up to 30 minutes, that she had to lie down three to four times per day for 30 minutes to an hour at a time, and that she had significant weight lifting and carrying restrictions, as well as restrictions on her movements. The ALJ concluded that this assessment was at odds with Dr. Schatten's prior observations and contrary to Phillips's

20

admissions concerning her activities.[9]

Dr. Schatten also indicated that a sleep disorder was a reason for Phillips's disability. However, Phillips reported that she slept a full night most of the time.

Furthermore, Phillips testified that urinary tract problems were symptomatic of her Sjögren's syndrome, and that she experienced such problems, and other related symptoms on "a daily basis every day." But, as of January 14, 1999, a consulting physician reported that Phillips's urinary tract symptoms had been "completely resolved."

In sum, the ALJ articulated several reasons for giving less weight to the treating physician's opinion. Thus, this Court readily concludes that the ALJ's determination that Dr. Schatten's opinion should be given little weight is supported by substantial evidence. Therefore, the ALJ's decision to limit Phillips to sedentary work is supported by substantial evidence.

B.    Grids Versus Vocational Expert

As outlined above, the ALJ used the five-step process and determined that: (1) Phillips was not performing substantial, gainful activity; (2) Phillips had severe

---

[9]Phillips's reported activities included household chores, dining out, visiting with friends, shopping, trips away from home that involved significant time in the car or airplane, walking, lifting weights, and doing water aerobics. There was also evidence that on one occasion, Phillips did yard work, despite her testimony that she "was not a gardener," and despite Dr. Schatten's assessment that she could never crawl or climb, and that she could only occasionally bend, squat, or reach.

21

impairments; (3) Phillips's severe impairments did not meet or equal any impairment listed in the regulations; and (4) Phillips could not return to her past relevant work. The issue in this case is how the ALJ applied step five.[10] That is, we must determine when an ALJ may rely on the grids and when an ALJ is required to consult a vocational expert under step five.

The general rule is that after determining the claimant's RFC and ability or inability to return to past relevant work, the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform. However, "[e]xclusive reliance on the grids is not appropriate either when [the] claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills." Francis v. Heckler, 749 F.2d 1562, 1566 (11th Cir. 1985) (emphasis added) (citing Broz v. Schweiker, 677 F.2d 1351, 1361 (11th Cir. 1982), adhered to sub nom. Broz v. Heckler, 711 F.2d 957 (11th Cir. 1983)); see also Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Charter, 86 F.3d 1072, 1077 (11th Cir. 1996); Martin v. R.R. Ret. Bd., 935 F.2d 230, 234 (11th Cir. 1991); Walker v. Bowen, 826 F.2d 996, 1002-03 (11th Cir. 1987); Sryock v.

---

[10]At step five, the burden shifted to the Commissioner to prove that other jobs exist in the national economy that Phillips is able to perform. Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996).

22

Heckler, 764 F.2d 834, 836 (11th Cir. 1985).

Therefore, we must determine whether either of these two conditions exist in this case. If either condition exists, the ALJ was required to consult a vocational expert.

C.    Exertional Limitations

The first condition that requires the ALJ to consult a vocational expert is when the claimant's exertional limitations prevent the claimant from performing a full range of employment.[11]  This Court has interpreted a "full range of employment" as being able to do "unlimited" types of work at the given exertional level. Ferguson v. Schweiker, 641 F.2d 243, 248 (5th Cir. Unit A Mar. 30, 1981),[12] overruled on other grounds, Johnson v. Heckler, 767 F.2d 180, 183 & n.13 (5th Cir. 1985); see also Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992).  In this case, the ALJ must determine whether Phillips can perform a full range or

---

[11]There are two types of impairments at issue in Phillips's case: exertional limitations and nonexertional limitations.  The terms exertional and nonexertional describe types of functional limitations or restrictions resulting from a medically determinable physical or mental impairment. See Social Security Ruling 96-4, 61 Fed. Reg. 34488 (July 2, 1996). Exertional limitations affect an individual's ability to meet the seven strength demands of the job: sitting, standing, walking, lifting, carrying, pushing, and pulling. Id.  Nonexertional limitations or restrictions affect an individual's ability to meet the other demands of jobs and include mental limitations, pain limitations, and all physical limitations that are not included in the seven strength demands. Id.

[12]The Eleventh Circuit is bound by Fifth Circuit precedent decided before October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

unlimited types of work at the sedentary level given her exertional limitations.[13]

If the ALJ concludes that Phillips cannot perform a full range or unlimited types of work at the sedentary level given her exertional limitations, then the ALJ must consult a vocational expert to determine whether there are sufficient jobs at the sedentary work level within the national economy that Phillips can perform. If, however, the ALJ concludes that Phillips can perform a full range or unlimited types of work at the sedentary level despite any exertional limitations, the ALJ next must determine to what extent Phillips's nonexertional limitations affect her ability to secure employment at the sedentary work level in the national economy.

D.    Nonexertional Limitations

When determining to what extent Phillips's nonexertional limitations affect her ability to secure employment in the national economy, the test is slightly different. When considering Phillips's nonexertional limitations, the ALJ need only determine whether Phillips's nonexertional impairments significantly limit her basic work skills. Jones, 190 F.3d at 1229; Wolfe, 86 F.3d at 1077; Walker, 826 F.2d at 1002-03; Francis, 749 F.2d at 1566. This Court has interpreted

---

[13]As this Court stated in Sryock:
The grid regulations are not applicable in all situations. At a given residual functional capacity, if a claimant is capable of some work at that level but not a full range of work, then that level of the grids is not applicable. . . . Second, in determining residual functional capacity only exertional limitations are considered, *i.e.,* ability to lift, stand, push, pull, handle, etc.
Sryock, 764 F.2d at 836 (citations and internal indentation omitted).

"significantly limit basic work skills" as limitations that prohibit a claimant from performing "a <u>wide</u> range" of work at a given work level. See <u>Foote v. Chater</u>, 67 F.3d 1553, 1559 (11th Cir. 1995) (The ALJ must determine "whether the nonexertional limitations are severe enough to preclude a <u>wide range of employment at the given work capacity level</u>." (emphasis added) (internal quotation marks and citations omitted)).

If the ALJ determines that Phillips's nonexertional limitations do not significantly limit her basic work skills at the sedentary work level, then the ALJ may rely on the grids to determine if Phillips is disabled. If, however, the ALJ determines that Phillips nonexertional limitations significantly limit her basic work skills at the sedentary work level, then the ALJ must consult a vocational expert.[14]

E. Phillips's Limitations

In this case, the ALJ did not specifically determine whether Phillips's exertional limitations prohibited her from a full range or unlimited types of work at the sedentary work level. Although the ALJ discredited much of Phillips's

---

[14]A few isolated cases contain language that might be interpreted as, at the very least, blurring the line between exertional limitations and nonexertional limitations, on the one hand, and a full range or unlimited types of work and wide range or significantly limiting basic work skills on the other. See, e.g., Passopulos v. Sullivan, 976 F.2d 642, 648 (11th Cir. 1992); Allen v. Sullivan, 880 F.2d 1200, 1202 (11th Cir. 1989). However, we do not read these decisions as creating any intra-circuit conflict. In any event, the prior precedent rule requires this Court to follow the decision issued first in time that established the appropriate test. Morrison v. Amway Corp., 323 F.3d 920, 929 (11th Cir. 2003).

testimony concerning her limitations, the ALJ nonetheless concluded that Phillips suffered from Sjögren's syndrome and fibromyalgia, and that these were "'severe' impairments." It is possible that Phillips suffered exertional limitations that rendered her unable to perform unlimited types of work at the sedentary level. On the other hand, it is also possible that, while severe, Phillips's Sjögren's syndrome and fibromyalgia did not affect her exertional capabilities at the sedentary work level -- after all, the ALJ specifically considered Phillips's Sjögren's syndrome and fibromyalgia when limiting Phillips to sedentary work. However, the ALJ must address and resolve this issue in the first instance before relying on the grids. Because the ALJ did not address this issue, we remand this case to the Commissioner so that the ALJ may consider whether Phillips's exertional limitations affect her ability to perform a full range or unlimited types of sedentary work.

The ALJ also identified one specific nonexertional limitation – that Phillips was limited to "entry level work in light of her assertion that she can only handle one thing at a time to avoid stress." Given that the ALJ limited Phillips's employment at the sedentary level to jobs that do not involve multi-tasking, the ALJ must specifically determine in the first instance whether such a restriction significantly limits Phillips's basic work skills; that is, whether there are a wide

26

range of sedentary jobs that do not require multi-tasking.  <u>Foote</u>, 67 F.3d at 1559 ("The ALJ must make a specific finding as to whether the nonexertional limitations are severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations." (internal quotation marks and citations omitted)).  The ALJ must address and resolve this issue before relying on the grids.  Because the ALJ did not address this issue, we remand this case to the Commissioner so that the ALJ may consider whether Phillips's nonexertional limitations significantly limit her basic work skills at the sedentary work level.

### III. CONCLUSION

For all the above reasons, we vacate the district court's order affirming the denial of disability insurance benefits to Phillips and remand this case to the Commissioner to reconsider Phillips's application for disability insurance benefits under the standards outlined above.  By this opinion, we do not suggest that Phillips is entitled to disability insurance benefits.  Rather, this opinion speaks only to the process the ALJ must engage in and the findings and analysis the ALJ must make before electing to use the grids or consult a vocational expert.

VACATED and REMANDED.