[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APR 3, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-12813

_____

D. C. Docket No. 04-00401-CV-1-SPM-AK

JOE L. MILLS, JR.,

Plaintiff-Appellant,

versus

MICHAEL J. ASTRUE,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(April 3, 2007)**

Before EDMONDSON, Chief Judge, BIRCH and WILSON, Circuit Judges.

PER CURIAM:

Joe Mills, Jr. appeals the district court's order affirming the Commissioner's

denial of his application for disability insurance benefits and for supplemental

security income benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3). Mills argues that the administrative law judge ("ALJ") erred in rejecting without good cause the opinion of his treating psychiatrist, Dr. Ramon Enrique Pino.

BACKGROUND

Mills applied for disability insurance benefits and for supplemental security income benefits, alleging a disability onset date of January 6, 1999 due to a compressed disc in his lower back with a post-surgical defect, sacroiliac joint dysfunction, lower back pain with radiation to lower buttock and leg, anxiety, and depression. The ALJ denied the applications, and the Appeals Council denied Mills' request for review. Mills sought review from the district court. The magistrate judge issued its report and neither party filed any objections. The district court entered an order adopting the magistrate judge's report and affirming the Commissioner's decision to deny benefits.

The relevant details of Mills' psychiatric treatment are as follows. Mills received treatment from psychiatrist Dr. Raymond Pino, following his admission to Shands Hospital for depression and for suicidal ideation on August 30, 1998. At discharge on September 5, 1998, Mills' condition had improved and his depression was "under control" according to Pino's discharge summary. Pino diagnosed Mills with "a major depressive disorder, recurrent, with suicidal ideas" and prescribed

medications for Mills, including Effexor to treat depression.

In April 1999, Mills saw neurologist Dr. Efrain Salgado for injuries sustained in a fall. At that time, Mills reported having discontinued the psychotropic medications prescribed by Dr. Pino out of fear of mixing medications. He also reported no recurrent problems with depression. Dr. Salgado referred Mills to Dr. Rigoberto Puente-Guzman of Rehabilitation Medicine Associates for pain Mills was experiencing in his lower back.

At Mills' initial visit to Dr. Puente-Guzman on May 12, 1999, the doctor placed him on sedentary, light level activity and warned him to avoid climbing or repetitive bending or stopping. Mills continued treatment with Dr. Puente-Guzman throughout the summer and on November 1, 1999, Dr. Puente-Guzman determined Mills had reached Maximum Medical Improvement ("MMI") with a permanent impairment rating of 7.0%.

When Dr. Puente-Guzman examined Mills on December 6, 1999, Mills reported that his pain had worsened and he was having trouble with depression, anxiety, and anger. The doctor's notes indicate that Mills underwent a Functional Capacity Evaluation on November 17, 1999 which showed that he could perform medium category work. Dr. Puente-Guzman recommended a psychological consultation. He repeated this recommendation when Mills returned on February 9,

2000 complaining of lower back pain and numbness.

On March 13, 2000, Mills saw Dr. Michael Amiel, a psychiatrist, for depression and anxiety. Dr. Amiel determined that Mills suffered from a mood disorder partially caused by the work injury in January 1999. Amiel found that Mills' global assessment functioning ("GAF") score was 60 and, although not at MMI, he did not present any significant psychiatric restrictions. He recommended Mills attend weekly psychotherapy for three months.

Mills received a psychiatric review with accompanying mental residual function capacity assessment ("MRFC") on June 19, 2000. The MRFC indicated that Mills displayed characteristics of an affective disorder and somatoform disorder. The assessment showed a slight functional limitation in Mills' daily living activities and his maintenance of social functioning. It further indicated moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychological symptoms, and to accept instructions and respond criticism from supervisors.

Beginning July 14, 2000, Mills attended psychotherapy sessions with Dr. Paula Lovett. At the initial interview, Dr. Lovett performed several psychological tests. She diagnosed Mills as "experiencing a depressive disorder; NOS [not

4

otherwise specified]," and "a pain disorder associated with both psychological factors and a general medical condition." She noted that this was directly related to his work injury in January 1999. She further indicated a GAF of 60, but withheld prognosis pending treatment.

On August 21, 2000, Mills asked Dr. Puente-Guzman for a trial of antidepressant medication because of problems with his mood. He attend two more psychotherapy sessions with Dr. Lovett on September 8th and September 11th. On October 2, 2000, Mills reported to Dr. Puente-Guzman that his condition was "overall stable."

A second residual functioning capacity assessment and MRFC were completed on October 17, 2000. The MRFC concluded that Mills was moderately limited in his abilities to maintain socially appropriate behavior, get along with coworkers, and sustain concentration to complete a normal workday and workweek.

Dr. Pino saw Mills on March 27, 2001 and determined his GAF score was 71. His notes indicate that Mills was oriented and that there was no evidence of cognitive deficits. Additionally, Mills had no current suicidal ideas and his judgment and insight were good. On April 24, 2001, Dr. Pino determined that Mills' GAF remained at 71.

On May 22, 2001, Dr. Pino noted that Mills had reached MMI but he needed to continue therapy to treat his illness, to attempt to alleviate his suffering, and to prevent suicidal depressive relapse. Dr. Pino recommended outpatient, individual bio-psycho-social therapy.  He determined that Mills' GAF remained at 71.

On May 23, 2001, Dr. Pino administered a MMI, Evaluation of Psychiatric Impairment, and concluded that Mills' psychiatric impairment rating was 12% and that his GAF was 41. The evaluation indicated no intellectual impairment, a severe deficit in thinking, a poor significant deficit in judgment, and severe mood and behavioral problems.  Dr Pino's evaluation also indicated that Mills had plateaued in his treatment and that he had poor improvement potential.

Mills was readmitted to the hospital on July 27, 2001 for depression after he told his wife he planned to commit suicide.  Mills complained of nightmares and visual and auditory hallucinations.  Mills was diagnosed with, and treated for, depression and suicidal ideation, and he was released the following day.

On August 1, 2001, Mills saw Dr. Puente-Guzman and denied that he would ever kill himself.  The doctor concluded that Mills should continue "with full-time, sedentary to light duty restrictions."  On August 15, 2001, Mills saw Dr. Pino who determined that Mills had reached MMI, but still needed therapy to alleviate suffering and prevent relapse.  Mills' GAF remained at 41.  Dr. Pino recommended

6

outpatient, individual therapy.

Dr. Pino administered a MRFC on September 5, 2001, which indicated that Mills had a mild limitations in his abilities to (1) remember locations and simple instructions, (2) carry out simple instructions, (3) make work-related decisions, (4) ask simple questions or request assistance, (5) be aware of normal hazards and take appropriate precautions, and (6) set realistic goals. The MRFC also indicated a moderate limitation in Mills' ability to remember detailed instructions and sustain an ordinary routine without special supervision, and a marked limitation in his ability to carry out detailed instructions. Mills showed an extreme limitation in his ability to (1) maintain attention and concentration for extended periods of time, (2) perform activities within a schedule, (3) work in coordination with others without distraction, (4) complete a normal workday or workweek, (5) interact appropriately with the general public, (6) accept instructions and respond to criticism, (7) get along with coworkers without distracting them, and (8) maintain socially appropriate behavior.

On October 19, 2001, Dr. Puente-Guzman discontinued Mills' oxycontin prescription because of Mills' inability to follow the narcotic contract agreement. In a psychotherapy session with Dr. Lovett that same day, Mills complained of frustration with Dr. Puente-Guzman's treatment and the system. On October 31,

7

2001, Mills called Dr. Lovett to say he planned to go to the psychiatric hospital because of pain. The doctor told his wife that the hospital was unlikely to admit him unless he was suicidal and the wife indicated that she didn't want to travel to the hospital if there was no chance of admission.

On November 15, 2001, Dr. Lovett reviewed Mills' file to determine whether he reached MMI. She completed a medical report which indicated that he had reached MMI on 11/15/01 with a 3% permanent impairment rating. Dr. Lovett indicated that there were no psychological restrictions and deferred to Dr. Puente-Guzman for physical restrictions.

Mills returned to Dr. Pino on January 18, 2002. Dr. Pino concluded Mills' GAF score was 41. Dr. Pino diagnosed Mills with "major depression, with anxiety, [and with] insomnia that is partially treated." After seeing Mills in January and March 2002 with an unchanged condition, Dr. Puente-Guzman determined based on a clinical pain assessment that Mills had chronic pain syndrome based on recurrent pain on July 1, 2002. Dr. Puente-Guzman opined that Mills was mildly restricted to full time sedentary to light duty, but also noted that he deferred to psychiatrists as to any psychological issues.

At the benefits hearing, the ALJ posed one hypothetical to the vocational expert ("VE") asking what employment would be available to a man with Mills'

educational background and physical limitations that was "limited to unskilled work activity not requiring social interactions beyond a few words." The VE concluded that the individual could perform three jobs–surveillance system monitor, ticket seller, and parking lot attendant. When Mills' attorney posed a hypothetical using the same restrictions but adding "no social interaction" and difficulty concentrating for more than 20 to 30 minutes at a time. The VE found that the person could not perform those three jobs or any other job.

The ALJ denied benefits finding that although Mills had not engaged in substantial gainful activity since the alleged onset of the disability and he had severe impairments of lumbosacral disease and depressive disorder, these impairments did not meet or medically equal one of the listed impairments. The ALJ did not give Dr. Pino's findings significant weight on the basis that the limitations were "excessive" and were "not supported by evidence in the record." The ALJ specifically stated that Mills had discontinued his psychotropic medications without any recurrence of depression, and that Dr. Puente-Guzman's findings regarding Mills' limitations contradicted Dr. Pino's findings. Although the ALJ found Mills could not return to his past relevant work, it concluded that there were significant number of jobs in the economy that he could perform.

STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, we must affirm the Commissioner's decision if we determine that: (1) the decision reached is supported by substantial evidence in the record; and (2) the correct legal standards were applied. *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1158 (11th Cir. 2004). "Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Id.* at 1158-59.

The failure of a party to object to the magistrate report precludes review of findings of fact except on grounds of plain error or manifest injustice, but does not limit review of legal conclusions. *United States v. Roberts*, 858 F.2d 698, 701 (11th Cir. 1988); *United States v. Warren*, 687 F.2d 347, 348 (11th Cir. 1982). Here magistrate and district court reviewed the ALJ's findings for substantial evidence. Because this is a legal conclusion rather than a finding of fact, we can exercise judicial review despite Mills' failure to object to the magistrate report.

DISCUSSION

Mills argues that the ALJ gave improper weight to Dr Pino's medical opinion. Generally, the opinions of examining physicians are given more weight

10

than non-examining, treating more than non-treating, and specialists on issues within their areas of expertise more weight than non-specialists. 20 C.F.R. § 404.1527(d)(1), (2) & (5). The opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004). Good cause exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41. If the ALJ does not give the treating doctor's opinion substantial weight, it must clearly articulate its reasons, and failure to do results in reversible error. 20 C.F.R. § 404.1527(d)(2); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ's proffered reasons for discounting the treating doctor's opinion must be supported by substantial evidence. *Lamb v. Bowen,* 847 F.2d 698, 703 (11th Cir. 1988). However, when an incorrect application of the regulations results in harmless error because the correct application would not contradict the ALJ's ultimate findings, the ALJ's decision will stand. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983).

Mills has had a number of treating physicians. He sought treatment from Dr. Salgado and Dr. Puente-Guzman for his back problems and from Dr. Pino and Dr.

11

Lovett for his mental condition. Dr. Pino found that Mills suffered from significant psychological limitations on his ability to work. The ALJ gave Dr. Pino's findings no significant weight finding them "excessive" and not supported by the evidence in the record. The ALJ specifically reasoned that (1) Mills had discontinued his psychotropic medications in 1999 with no recurrent problems with depression and (2) Dr. Pino's findings were contrary to Dr. Puente-Guzman's July 1, 2002 findings of only mild limitations.

The ALJ's articulated reasons are not supported by substantial evidence. First, it is evident from the record that Mills had reoccurring problems with depression after 1999. He reported problems with his mood beginning in December 1999, requested medication for his mood in August of 2000, and was again hospitalized for treatment of depression in July of 2001. Second, Dr. Puente-Guzman focused his treatment on Mills' back injury; he does not specialize in mental health and referred Mills' to a specialist for psychiatric care. In contrast, Dr. Pino, a psychiatrist, had a long-standing treatment relationship with Mills beginning from his hospitalization for psychiatric issues in 1998. Dr. Pino specifically treated Mills' psychological problems using drug therapy to combat his depression. Under the regulations, the opinion of such a treating physician and specialist in the area is generally entitled to more weight than that of a non-treating

12

doctor and non-specialist. *See* 20 C.F.R. 404.1527(d)(2)(ii) & (5). Furthermore, Dr. Puente-Guzman's and Dr. Pino's are not in conflict because Dr. Puente-Guzman based his functional limitation assessment on his treatment of Mills' physical condition and specifically deferred the assessment of any mental limitations to the psychiatrists in his report. Therefore, we cannot find that substantial evidence supported the ALJ's articulated reasons for discounting Dr. Pino's medical opinion of Mills' psychiatric condition.

However, our review does not end there, because the decision need not be disturbed if the error was harmless. *See Diorio*, 721 F.2d at 729 (finding that ALJ's mischaracterization of past work was harmless error, because it was irrelevant when there was no finding of severe impairment). While there is evidence in the record, such as Dr. Lovett's and Dr. Amiel's opinions, that supports the ALJ's final decision, the ALJ did not mention nor explain the weight given to either of these opinions. We cannot say the error was harmless without re-weighing the evidence. To do so would call for conjecture that invades the province of the ALJ. *See Moore v. Barnhart*, 405 F.3d 1208, 1214 (11th Cir. 2005) (per curiam) (remanding where the ALJ failed to consider certain factors and indicate their impact on his ultimate functional capacity conclusion); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546 (6th Cir. 2004)("A court cannot excuse the

13

denial of a mandatory procedural protection simply because, . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely.")

The ALJ is not required to give the treating doctor's opinion substantial weight, but if he does not do so, he must show good cause by clearly articulating reasons that are supported by the evidence.  Because this ALJ has failed to do so, we reverse and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.