[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13325
Non-Argument Calendar
_____

D.C. Docket No. 5:12-cv-00244-PRL

JAMES SZILVASI,

Plaintiff-Appellant,

versus

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 7, 2014)

Before HULL, MARCUS, and MARTIN, Circuit Judges.

PER CURIAM:

James Szilvasi appeals the district court's order affirming the Social Security

Administration's (SSA) denial of his application for disability insurance and

supplemental security income.  Szilvasi argues that the Administrative Law Judge (ALJ) failed to give proper weight to the medical opinions of his treating physician and therapist.  He also argues that the ALJ failed to pose hypothetical questions to the SSA's vocational expert that took into account all of his impairments.  After careful review, we affirm.

## I.

We first consider Szilvasi's argument that the ALJ erred by choosing not to give substantial weight to the opinions of Dr. Thomas Lafferty and Brian McCartney, his treating physician and therapist.  Dr. Lafferty reported that Szilvasi suffered a number of physical limitations related to his fibromyalgia and arthritis. For example, Dr. Lafferty believed that Szilvasi was incapable of sitting for more than 30 minutes at a time or carrying any heavy objects, even objects weighing less than 10 pounds.  In the same way, McCartney believed that Szilvasi suffered from a number of mental and emotional limitations.  In McCartney's opinion, Szilvasi was incapable of maintaining regular attendance at work, dealing with normal work stress, or completing a normal workday without interruptions.  According to McCartney, these limitations were a result of Szilvasi's chronic pain and his medications, which interfered with his memory, concentration, and ability to cope with anxiety.  The ALJ considered both of these opinions but found that they were entitled to little weight.

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based on proper legal standards." Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997). "If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks omitted). We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner. Id.

The opinion of a treating physician must be given "substantial or considerable weight" unless there is "good cause" not to do so. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004) (quotation marks omitted). This Court has concluded that good cause exists when: (1) the opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the opinion was conclusory or inconsistent with the doctor's own medical records. Id. at 1240–41; see also 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (providing that the medical opinion of a treating source is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record). Also, an

3

ALJ does not need to give a treating physician's opinion considerable weight if the claimant's own testimony regarding his daily activities contradicts that opinion. See Phillips, 357 F.3d at 1241. Generally, the more consistent a physician's opinion is with the record as a whole, the more weight an ALJ can place on that opinion. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). "[T]he ALJ may reject any medical opinion if the evidence supports a contrary finding." Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987) (per curiam).

## A.

Against this legal backdrop, we conclude that substantial evidence supported the ALJ's decision to give diminished weight to Dr. Lafferty's opinions. Indeed, the ALJ provided a number of persuasive justifications for finding that Dr. Lafferty's opinions were inconsistent with the record as a whole.

First, the ALJ found that portions of Dr. Lafferty's opinions were contradicted by Szilvasi's testimony at the hearing. See Phillips, 357 F.3d at 1241. For example, while Dr. Lafferty stated that Szilvasi could only sit for 30 minutes at a time, Szilvasi testified that he could sit for up to 2 hours without limitation. In the same way, Dr. Lafferty also reported that Szilvasi could never lift any substantial weight, but Szilvasi estimated that he could lift a gallon of milk.

Second, several of Dr. Lafferty's opinions were also inconsistent with his own previous observations and notations made throughout Szilvasi's medical

4

records.  See id. at 1240–41 (stating that "good cause" for not giving a treating physician's opinion substantial weight exists where the opinion is inconsistent with the doctor's own medical records).  In one report, for example, Dr. Lafferty indicated that Szilvasi only experienced occasional or intermittent swelling in his knees, hands, and feet.  In another report, Dr. Lafferty found that Szilvasi had full muscle strength in all groups and indicated that his condition had improved with medication.  These observations suggest that Szilvasi's impairments were not as severe or limiting as Dr. Lafferty believed.

Finally, the ALJ found that Dr. Lafferty's opinions could not be reconciled with the rest of the clinical and diagnostic evidence in the record.  After separately examining Szilvasi, Dr. Samer Choksi concluded that Szilvasi's subjective complaints of fibromyalgia and cervical and lower back pain were not consistent with the objective medical evidence.  See id. (looking to whether the treating physician's opinion was bolstered by the evidence).  In the same way, Dr. Robert Kelly, a state agency physician, estimated that Szilvasi would be able to sit with normal breaks for a total of about 6 hours in an 8-hour workday with no postural, manipulative, visual, communicative, or environmental limitations.  Dr. Kelly also stated that Szilvasi could frequently lift objects up to 25 pounds and occasionally lift weights up to 50 pounds.  Finally, the ALJ also relied on an x-ray examination of Szilvasi's right hand, which revealed no evidence of fracture or acute pathology.

Rather, the x-ray unremarkably demonstrated normal bone alignment, joint spaces, and soft tissues.  Based on this record, we conclude that substantial evidence supports the ALJ's weighing of Dr. Lafferty's opinions.  See Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005) (indicating that while a treating physician's testimony can be particularly valuable in fibromyalgia cases, the opinion may be properly discounted if the ALJ articulates specific justification for doing so).

### B.

We also conclude that the ALJ's decision to give "minimal weight" to the opinions of Szilvasi's therapist, Brian McCartney, was supported by substantial evidence.

As a preliminary matter, because McCartney is a therapist, not a physician, his opinions are not an acceptable medical source to establish the existence of a medical impairment.  See 20 C.F.R. § 404.1513(a), (d)(1).  More importantly, McCartney's opinion that Szilvasi lacked the mental capacity to do unskilled work was not supported by any independent clinical findings.  Instead, McCartney's opinion was based on his impression that Szilvasi's chronic pain and medications would interfere with his ability to concentrate and function, which was beyond McCartney's expertise to evaluate as a therapist.

Beyond that, the ALJ also found that McCartney's opinions were inconsistent with the rest of the evidence in the record.  After conducting an

independent mental examination, Ann Adams, a state agency psychologist, concluded that Szilvasi was able to understand and follow at least simple instructions, concentrate for short time periods, and make simple work-related decisions. Another state agency psychologist, Theodore Weber, also examined Szilvasi and found that he was not significantly limited in his ability to understand, remember, and carry out very short and simple instructions. According to Weber, Szilvasi himself reported that his major limitations were physical, not mental. Based on this record, the ALJ was entitled to give McCartney's opinions little weight and to conclude that Szilvasi's mental impairments were not so severe that it would preclude him from performing work on a regular and sustained basis.

## II.

We next consider Szilvasi's argument that the ALJ failed to pose adequate hypothetical questions to the SSA's vocational expert because the questions did not take into account all of Szilvasi's impairments. At the hearing, the ALJ asked the vocational expert whether there would be any jobs in the national economy suitable for an individual with Szilvasi's age, education, and work experience who had the following limitations: "could lift 20 pounds occasionally and 10 pounds frequently, performing simple, repetitive tasks, with superficial interactions with others." The expert replied that such an individual would be able to work as a small products assembler, a light housekeeper, or a light trimmer.

7

Szilvasi argues that the ALJ's question was faulty because it failed to take into account all of his impairments, including his moderate difficulties in social functioning, concentration, and persistence, as well as his inability to complete a normal workday without an unreasonable number of breaks. This argument fails.

As part of its determination of whether a claimant is disabled, the Commissioner must assess whether there are significant numbers of jobs in the national economy that the claimant can perform. Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may make this assessment either by applying the Medical Vocational Guidelines or by obtaining the testimony of a vocational expert. Phillips, 357 F.3d at 1239–40. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Wilson v. Barnhart, 284 F.3d 1219, 1227 (11th Cir. 2002) (per curiam).

In Winschel, we held that an ALJ must account for the claimant's identified limitations in his ability to maintain his concentration, persistence, or pace, and we rejected the argument that an ALJ satisfies this obligation by merely asking generally whether there are any jobs in the national economy that involve simple, routine tasks or unskilled work. See 631 F.3d at 1180. However, we also clarified that hypothetical questions discussing unskilled work may be appropriate where

8

the medical evidence demonstrates that the claimant can only engage in simple, routine tasks or unskilled work as a result of the claimant's limitations.  Id. Because the ALJ in Winschel did not indicate that medical evidence suggested that the claimant's ability to work was unaffected by his limitations, nor did the ALJ otherwise account for the limitations in the hypothetical questions, we concluded that the vocational expert's testimony was not substantial evidence that supported the ALJ's conclusion.  Id. at 1181.

Here, unlike the case in Winschel, the ALJ clearly considered the medical evidence regarding all of Szilvasi's limitations before finding that he could complete simple routine tasks.  As mentioned above, the ALJ gave substantial weight to the opinions of Ann Adams and Theodore Weber, two state agency psychologists.  Adams noted that Szilvasi was able to understand and follow at least simple instructions, concentrate for shorter time periods, and make simple work-related decisions.  In the same way, Weber also stated that Szilvasi was not significantly limited in his ability to understand, remember, and carry out very short and simple instructions.  Based on this medical evidence, the ALJ made an independent determination that Szilvasi retained the ability to "perform simple, repetitive tasks with superficial interaction with others."  Thus, unlike in Winschel, the ALJ here did not simply assume that Szilvasi could perform unskilled work and simple routine tasks when it posed the hypothetical questions to the vocational

9

expert.  Instead, the ALJ examined Szilvasi's medical records and made an independent finding regarding the extent to which his ability to work was affected by all of his impairments.  Therefore, we conclude that the ALJ properly took into account all of Szilvasi's limitations when it posed hypothetical questions to the vocational expert.

For these reasons, we affirm.

**AFFIRMED.**