[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
SEPTEMBER 3, 2010
JOHN LEY
CLERK

_____

No. 10-10428
Non-Argument Calendar

_____

D.C. Docket No. 2:09-cv-00746-JFG

ALICE MUHAMMAD,
o.b.o. T.I.M.,

                                        Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 3, 2010)

Before EDMONDSON, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Alice Muhammad, on behalf of her minor son, T.I.M., appeals from the

district court's order affirming the Social Security Commissioner's ("Commissioner") denial of T.I.M.'s application for disability insurance benefits, pursuant to 42 U.S.C. § 405(g). Muhammad argues that the district court erred in affirming the Commissioner's decision, because: (1) substantial evidence did not support the Administrative Law Judge's ("ALJ") decision not to accord substantial weight to the opinions of Dr. Alaa Elrefai, T.I.M.'s treating psychiatrist; and (2) substantial evidence did not support the ALJ's determination that T.I.M's impairments did not functionally equal an impairment listed in 20 C.F.R. § 404, Subpart P, appendix I, and that T.I.M. thus was not disabled.

For the reasons set forth below, we affirm.

## I.

In November 2006, Muhammad filed an application for disability benefits on behalf of her six-year-old child, T.I.M. Muhammad identified T.I.M.'s disabling condition as ADHD. The Commissioner denied the application, and Muhammad requested a hearing before an ALJ.

The ALJ conducted a hearing in October 2008. During the hearing, Muhammad testified that T.I.M. had attended the first grade, and currently was in the second grade, at Epic Elementary School ("Epic"). Muhammad explained that T.I.M.'s school performance had improved during the second grade because he

2

was enrolled in special education classes. As a special-education student, T.I.M. received individualized attention from two or three teachers, and participated in a modified curriculum with a reduced workload. T.I.M. recently had received three A's and two B's in his report card. Muhammad explained that T.I.M.'s behavior during the second grade had varied, and that he had "ups and downs," but that T.I.M.'s behavior was "better" than it had been during the previous academic year.

Muhammad further testified that the individualized attention in the special education program had improved T.I.M.'s ability to stay "on task" in the classroom. Muhammad helped T.I.M. with his homework, and had noticed that T.I.M. had difficulty retaining or recalling information that he recently had reviewed. T.I.M. would not complete his homework if Muhammad left him by himself, and, as a result, she had to sit with him until he completed his homework. T.I.M. saw Dr. Elrefai, who worked at Western Mental Health Center ("Western"), twice a year, and saw counselors at Western once every one to two months.

The evidence reflected that, in November 2006, Muhammad completed a function report, in which she reported that T.I.M. did not experience any limitation in his ability to communicate with others (*i.e.*, having a conversation, telling a story, and using complete sentences). She reported that T.I.M.'s impairment limited his ability to understand and use information that he had learned, but that

3

T.I.M. was able to recite numbers, define common words, ask for the meaning of a word, and understand a joke. Muhammad also reported that T.I.M.'s impairment affected his behavior with others. She also stated, however, that T.I.M. was "loving," showed affection toward others, enjoyed being with other children his age, and enjoyed playing board games and games such as tag, hide-and-seek, and "pretend" games. Muhammad explained that, although T.I.M. was "very smart," it was difficult for him to focus, and his attention span endured for only a minute.

The record also included a teacher questionnaire, which Votura Mack, T.I.M.'s kindergarten teacher at South Hampton Elementary School ("South Hampton") completed in January 2007. Responding to questions concerning T.I.M.'s ability to acquire and use information, Mack reported that T.I.M. had "no problem" with comprehending oral instructions, understanding vocabulary, completing math problems, understanding and participating in class discussions, learning new material, recalling material that he previously had learned, and applying problem-solving skills in class discussions. T.I.M. had a "slight problem" with reading and comprehending written material, providing organized oral explanations and adequate descriptions, and expressing ideas in written form.

Responding to questions regarding T.I.M.'s ability to attend and complete tasks, Mack reported that T.I.M. had no problem with carrying out single-step

4

instructions, or completing his work without making careless mistakes. He had a slight problem with paying attention when spoken to directly, sustaining attention during play or sports activities, and carrying out multi-step instructions. Mack further reported that T.I.M. had "an obvious problem" with maintaining focus while changing from one activity to another, and working at a reasonable pace. T.I.M. had a "serious problem" with maintaining the focus necessary to finish an assigned task, completing schoolwork and homework, and working without distracting himself or others.

In the evaluation, Mack also answered questions concerning T.I.M.'s ability to interact with and relate to others. Mack reported that T.I.M. had no problem with playing cooperatively with other children, making and keeping friends, seeking attention appropriately, relating experiences and telling stories, interpreting facial expressions and body language, and using adequate vocabulary and grammar in everyday conversation. T.I.M. had a slight problem with respecting and obeying adults in authority. T.I.M. had an obvious problem with expressing anger appropriately, handling frustration, asking for permission in an appropriate manner, and using language appropriate to the situation and the listener. Mack specified that T.I.M. sometimes kicked and cursed when asked to perform a task, and that, while he was able to work independently, he wasted time

5

by not staying on task.

In a separate form addressing T.I.M.'s behavior at school, Mack reported that, between August and November 2006, T.I.M. "constantly" left his seat and moved from desk to desk. T.I.M. called Mack names once a week, and had kicked her. Mack also reported that, as of May 2007, T.I.M.'s behavior had "definite[ly]" improved, and that he had a "bad week" only once a month. T.I.M.'s kindergarten report card showed that he received grades of "excellent" or "satisfactory" in all categories.

In a report entitled "Individualized Education Program," ("IEP"), which was completed after T.I.M. finished the first grade, Epic staff reported that, during the first grade, T.I.M. had received several disciplinary write-ups. He displayed aggression toward others by kicking his teacher and engaging in frequent name-calling. He frequently left his seat in the classroom, used "ugly" language toward peers and his teacher, and had difficulty staying on task. During this school year, T.I.M. received an average grade of "F" in language arts, a "D" in reading, and a "D" in math. He received an average grade of "A" in music, physical education, science, and social studies. At the end of the first grade, T.I.M. could read only a few words, and experienced difficulty with math and written work, despite the fact that he had received the assistance of a tutor. Standardized achievement testing

showed that T.I.M.'s ability in mathematical reasoning and reading comprehension was at the low end of the average range, and that his basic reading ability was within the average range. T.I.M.'s listening comprehension was below average. Due to his deficient grades and behavioral problems, T.I.M. was transferred to special education classes.

T.I.M.'s medical records showed that, in the fall of 2006, Muhammad sought treatment for T.I.M. at Western. A December 2006 treatment plan showed that T.I.M. had been diagnosed with ADHD, and that he experienced educational problems. The treatment plan also noted that Muhammad had stated to Western staff that she hoped that T.I.M.'s treatment would enable him to "be more focused" and "pay attention," and decrease his hyperactivity. The treatment plan included T.I.M.'s global assessment functioning score ("GAF") of 52, which was associated with "moderate" difficulty in social and school functioning.

In February 2007, Dr. Thomas Boll, Ph.D., examined T.I.M. at the request of the Commissioner. Boll observed that T.I.M. "was able to provide reasonable amounts of information," and maintained good eye contact. During the examination, T.I.M. "tend[ed] to bounce in his chair," and, after a short time, became "moderately distractable, and wandered about the room playing with objects." Boll found that T.I.M.'s speech, conversation, and articulation were

adequate and normal, that his thought processes and achievement of developmental milestones were normal, and that T.I.M. did not suffer confusion or have "loose associations." In addition, Boll determined that T.I.M.'s thought content was normal, and that his affect and mood were normal, noting the absence of anxiety or mood swings. Boll noted that, while T.I.M. had "some disruption" with his concentration, persistence, and pace, his "appearance, behavior, level of activities, interests and ability to relate to others is normal." Boll specified that, in making the findings described above, he had considered not only his personal observations, but also T.I.M.'s medical records.

T.I.M.'s records further showed that, between November 2006 and December 2007, Dr. Elrefai changed T.I.M.'s prescription several times, noting that some prescriptions were ineffective. In December 2007, Dr. Elrefai prescribed Focalin for T.I.M., noting that this medication "worked fine." Between the end of December 2007 and May 2008, T.I.M.'s prescription remained stable. Between January and December of 2007, James Wagner, a child therapist at Western, noted that T.I.M.'s behavior at school varied. In January and February 2007, Wagner noted that T.I.M.'s behavior had improved, and that he had received a good grade in conduct. In May 2007, Wagner noted that T.I.M. was "doing well," and that, while T.I.M. still experienced behavioral problems, these problems

had decreased.  At the end of August 2007, Wagner noted that T.I.M. was "doing well overall," that he was not aggressive, and that there were no reported issues with his behavior at school.  Also in August 2007, Wagner wrote a letter to Epic concerning T.I.M.'s treatment, in which he noted that T.I.M.'s most recent GAF score was 62, which was associated with mild symptoms and "some" problems with school functioning.   In December 2007, however, Wagner reported that Muhammad had described T.I.M.'s behavior at school as "uncontrollable." Nevertheless, in March and June 2008, a licensed professional counselor at Western noted that T.I.M. had made progress toward the objectives outlined in his treatment plan.

In August 2008, Dr. Elrefai completed an evaluation, in which he opined that T.I.M. had  marked limitations in the areas of acquiring and using information, attending and completing tasks, and interacting with and relating to others.

The ALJ denied benefits.  The ALJ found that T.I.M. had the following severe impairments: (1) ADHD; and (2) a specific learning disability.  The ALJ also found, however, that T.I.M. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled an impairment listed in the federal regulations at 20 C.F.R. § 404, Subpart P, appendix 1, and that

T.I.M. thus was not disabled. The ALJ explained that, in evaluating the extent of T.I.M.'s limitations, he found that Mack's evaluation was "highly probative" of T.I.M.'s "true functioning" because, in her professional capacity, Mack had close contact with T.I.M. over the course of a school year and was able to observe him in both academic and social settings. The ALJ characterized Mack's statements in her evaluation as stating that T.I.M. had only a slight problem in the area of acquiring and using information, and moderate problems in the areas of attending and completing tasks and interacting with others. The ALJ also noted that, in May 2007, Mack reported that T.I.M.'s behavior had improved.

The ALJ evaluated the extent of T.I.M.'s limitations in each of the six "domains" of functioning set forth in 20 C.F.R. § 416.926a(g)-(l). The ALJ found that T.I.M. had some, but "less than marked," limitations in the following domains: (1) acquiring and using information; (2) attending and completing tasks; and (3) interacting with and relating to others. In support of these findings, the ALJ relied heavily on Mack's evaluation and Dr. Boll's report. The ALJ noted that T.I.M. had received deficient grades in math, language arts, and reading during the first grade, but also noted that standardized achievement testing had shown that T.I.M.'s ability in these areas was within the average range, and that T.I.M. had received satisfactory grades during kindergarten and second grade. In

addition, the ALJ noted that medication, along with T.I.M.'s participation in a special education program, had improved his performance at school, and that T.I.M.'s GAF score had increased to 62 by August 2007. Addressing the final three domains of functioning, the ALJ determined that T.I.M. had no limitations in his abilities to move and manipulate objects, care for himself, or in his general physical health.

Based on the above, the ALJ concluded that T.I.M.'s impairments did not functionally equal a listed impairment, because he did not suffer from extreme limitations in any of the six domains of functioning, nor did he suffer from marked limitations in at least two of these six domains. The ALJ acknowledged that Dr. Elrefai had opined that T.I.M. suffered from marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting with and relating to others. The ALJ discounted Dr. Elrefai's opinions because he found that these opinions conflicted with Western's underlying treatment notes regarding T.I.M., T.I.M.'s improved GAF score, T.I.M.'s improved behavior and school performance, Mack's evaluation, and Muhammad's testimony. The ALJ additionally found that Dr. Elrefai saw T.I.M. only twice a year, and that these visits were "primarily for renewing his prescriptions." Accordingly, the ALJ concluded that Dr. Elrefai's opinions were not "well-supported" by the record.

Muhammad's request for review of the ALJ's decision was denied by the Appeals Council.

Muhammad subsequently filed a complaint in the district court, alleging that the ALJ's decision was not supported by substantial evidence. The Commissioner answered, requesting that the court affirm the denial of benefits. The district court entered an order affirming the Commissioner's judgment, stating that it had reviewed the record, and found that the ALJ's decisions were supported by substantial evidence.

## II.

In reviewing an ALJ's decision to discount the opinion of a treating physician, we consider whether the decision is supported by substantial evidence. *See Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004). "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). An ALJ is required to specify "what weight is given to a treating physician's opinion and any reason for giving it no weight." *Id.*; *see also* 20 C.F.R. § 416.927(d)(2). An ALJ must have "good cause" to discount the opinion of a treating physician. *Phillips*, 357 F.3d at 1240. "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence;

12

(2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Id.* at 1240-41. "A treating physician's report may be discounted when it is not accompanied by objective medical evidence." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1159 (11th Cir. 2004).

When determining the weight to accord to a treating physician's opinion, an ALJ should consider, among other things, the frequency with which the physician examines the patient, as well as the duration and nature of the doctor-patient relationship. 20 C.F.R. § 416.927(d)(2)(i)-(ii). When evaluating the evidence, the ALJ may consider data provided by non-medical sources such as educational personnel, including school teachers. 20 C.F.R. § 416.913(d)(2).

Here, substantial evidence supports the ALJ's decision to discount Dr. Elrefai's opinions that T.I.M. had marked limitations in the domains of acquiring and using information, attending and completing tasks, and interacting with and relating to others. Although Dr. Elrefai was T.I.M.'s treating psychiatrist, the ALJ had good cause to discount his opinions because the evidence supported a finding contrary to Dr. Elrefai's conclusions. *See Phillips*, 357 F.3d at 1240-41. Specifically, T.I.M.'s improved GAF score of 62, his kindergarten and second-grade report cards, his average-range scores on standardized achievement tests,

13

Dr. Boll's report, Mack's evaluation responses, and Muhammad's statements in the 2006 function report conflicted with Dr. Elrefai's opinion that T.I.M. had marked limitations in his ability to acquire and use information.

In addition, Dr. Elrefai's opinion that T.I.M. had marked limitations in his ability to interact with and relate to others was also contradicted by Mack's evaluation, in which she reported that T.I.M. had no trouble in making and keeping friends, playing cooperatively with other children, or telling stories. Moreover, in the function report, Muhammad had described T.I.M. as "loving," and had reported that T.I.M. enjoyed being with other children his age and playing games such as hide-and-seek. Dr. Boll found that T.I.M.'s ability to relate to others was "normal."

While Dr. Elrefai opined that T.I.M. had marked limitations in his ability to attend and complete a task, this opinion was somewhat contradicted by T.I.M.'s treatment notes from Western, which indicated that, as of March and June of 2008, he had made progress toward achieving the goal of increasing his ability to remain focused on a task. In addition, Wagner reported that T.IM.'s behavior largely had improved during most of 2007. Dr. Elrefai's opinion also conflicted, to a certain extent, with T.I.M.'s improved GAF score of 62, and Muhammad's testimony that T.I.M.'s behavior at school had improved.

14

Accordingly, while Dr. Elrefai's opinions were consistent with some of the evidence, such as T.I.M.'s poor grades and unruly behavior during the first grade, and Muhammad's testimony that she had to sit with T.I.M. in order for him to complete his homework, the record also included substantial evidence that supported conclusions contrary to Dr. Elrefai's conclusions that T.I.M. had marked limitations in several domains. *See Phillips*, 357 F.3d at 1240-41. Moreover, in his report, Dr. Elrefai did not specify what evidence he had considered in forming his opinions, nor did he offer any explanation or point to objective medical evidence in support of his conclusions that T.I.M. had marked limitations in several domains. Accordingly, Dr. Elrefai's report was conclusory in nature. *See Phillips*, 357 F.3d at 1240-41; *Crawford*, 363 F.3d at 1159. In addition, while Dr. Elrefai was T.I.M.'s treating physician, the record shows that he examined T.I.M. approximately twice a year. Accordingly, substantial evidence supported the ALJ's decision to discount Dr. Elrefai's opinions.

## III.

We review *de novo* the district court's determination of whether substantial evidence supports the ALJ's decision. *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002). "The [ALJ]'s factual findings are conclusive if supported by substantial evidence." *Id.*

15

An individual under the age of 18 is considered to be disabled if he has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). "Federal regulations set forth the process by which the SSA determines if a child is disabled and thereby eligible for disability benefits." *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391 F.3d 1276, 1278 (11th Cir. 2004). As part of this process, the ALJ must determine whether the child has a medically determinable impairment that is severe. *Shinn*, 391 F.3d at 1278; 20 C.F.R. § 416.924(c).

If the child has a severe impairment, the ALJ next determines whether the impairment "causes marked and severe functional limitations for the child." *Shinn*, 391 F.3d at 1278 (quoting 20 C.F.R. § 416.924(d)). This determination is made based upon a consideration of the Listing of Impairments, which is included in 20 C.F.R. § 404, Subpart P, appendix 1. *Shinn*, 391 F.3d at 1278; 20 C.F.R. § 416.925(a). A child's impairment is recognized as causing "marked and severe functional limitations if those limitations meet, medically equal, or functionally equal" an impairment described in the Listing of Impairments. *Shinn*, 391 F.3d at 1279 (quotation and alterations omitted); 20 C.F.R. § 416.924(d). If a child's

16

impairment does not meet or medically equal a listed impairment, an ALJ may still find that the child is disabled if his impairment functionally equals a listed impairment. *Shinn*, 391 F.3d at 1279.

In determining whether a child's impairment functionally equals a listed impairment, an ALJ must consider the extent to which the impairment limits the child's ability to function in the following six "domains" of life: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. *Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(b)(1). A child's impairment functionally equals a listed impairment, and thus constitutes a disability, if the child's limitations are "marked" in two of the six life domains, or if the child's limitations are "extreme" in one of the six domains. *Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(d).

Federal regulations set forth benchmarks that children of normal functioning should have achieved at a certain age. *Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(g)-(l). These regulations provide that, in the domain of acquiring and using information, a child between the ages of 6 and 12 should be able to learn to read, write, complete mathematics problems, and discuss history and science. 20 C.F.R. § 416.926a(g)(2)(iv). Children of this age also should be able to

17

demonstrate what they have learned through oral and written work, and use what they have learned in group work and class discussions. In addition, a child between the ages of 6 and 12 should be able to use an increasingly complex vocabulary to share information, ask questions, and express ideas. *Id.*

The regulations further provide that the domain of attending and completing tasks examines a child's ability to focus his attention on activities, and finish activities at an appropriate pace. 20 C.F.R. § 416.926a(h). In this domain, a child between the ages of 6 and 12 should be able to "focus [his] attention in a variety of situations in order to follow directions, remember and organize [his] school materials, and complete classroom and homework assignments." 20 C.F.R. § 416.926a(h)(2)(iv). In addition, the child should be able to transition between activities without distraction, stay in place when appropriate, and sustain his attention well enough to read by himself or complete a household chore. *Id.*

The federal regulations explain that the domain of interacting and relating with others addresses a child's ability to initiate and sustain emotional connections with others, develop and use appropriate language, cooperate with others, comply with rules, and respond to criticism. 20 C.F.R. § 416.926a(i). In this domain, a child between the ages of 6 and 12 should be able to develop lasting friendships with his peers, express his ideas and tell stories, and begin to understand how to

18

work in a group to solve a problem. 20 C.F.R. § 416.926a(i)(2)(iv).

The regulations provide that a child's limitation is "marked" where it is "more than moderate," but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). A marked impairment "seriously" interferes with a child's "ability to independently initiate, sustain, or complete activities." *Id.* An "extreme" limitation is a limitation that is "more than marked," and "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). In determining whether a child has "marked" or "extreme" limitations in a domain, an ALJ should consider how the child performs in a supportive setting, as well as the effects of medication or other treatment. 20 C.F.R. § 416.926a(a).

Here, substantial evidence supports the ALJ's determination that T.I.M. is not disabled, as he did not suffer extreme limitations in any one of the six domains, or marked limitations in at least two of the six domains. First, substantial evidence supports the ALJ's determination that T.I.M. had less-than-marked limitations in the domain of acquiring and using information. *See Wilson*, 284 F.3d at 1221; 20 C.F.R. § 416.926a(g)(2)(iv). While T.I.M. received deficient grades in reading, language arts, and math during the first grade, he received A's in science and social studies, and his standardized achievement scores reflected

19

that his ability in reading comprehension and mathematical reasoning fell within the average range. Mack reported that T.I.M. had "no problem" with learning new material and recalling material that he previously had learned, and T.I.M.'s kindergarten grades were "excellent" and "satisfactory." In completing the child function report, Muhammad described T.I.M. as "very smart," and reported that T.I.M. could define common words, ask for the meaning of a word, and understand a joke. Moreover, Dr. Boll found that T.I.M.'s thought processes and developmental milestones were normal.

Substantial evidence also supported the ALJ's determination that T.I.M. had less-than-marked limitations in the domain of interacting with and relating to others. *Wilson*, 284 F.3d at 1221; 20 C.F.R. § 416.926a(i)(2)(iv). Mack observed that T.I.M. had "no problem" with making and keeping friends, relating experiences and telling stories, and interpreting facial expressions and body language. These observations were consistent with Dr. Boll's opinion that T.I.M.'s ability to relate to others was normal, as well as with Muhammad's statements that T.I.M. enjoyed being with other children his age and playing games with other children. While T.I.M. manifested behavioral problems such as kicking and name-calling during kindergarten and first grade, Muhammad testified that T.I.M.'s behavior had improved during the second grade. In addition,

T.I.M.'s GAF score had improved to 62 by August 2007, indicating that his ability to interact with others in an appropriate manner had improved.

Although the evidence indicates that T.I.M. had a more serious problem in the domain of attending and completing tasks than he had in other domains, substantial evidence supports the ALJ's decision that T.I.M.'s limitations in this domain were less-than-marked, particularly in light of the fact that the ALJ was permitted to consider the improvements effected by T.I.M.'s medication and his participation in a special-education program. *See Wilson*, 284 F.3d at 1221; 20 C.F.R. § 416.926a(a), (h)(2)(iv). As noted above, T.I.M.'s GAF score had improved to 62 by August 2007. Dr. Boll found that, while T.I.M. was "moderately distractable," there was only "some disruption" in T.I.M.'s concentration and pace, and his behavior and activity levels were normal. In addition, T.I.M.'s treatment records from Western reflect that, in March 2008 and June 2008, T.I.M. had made progress toward the goals set forth in his treatment plan, such as improving his ability to concentrate and maintain focus. Wagner noted that, during the majority of 2007, T.I.M.'s behavior showed significant improvement. This was consistent with Mack's opinion that medication caused T.I.M.'s behavior to improve by May 2007.

Finally, we note that, even if substantial evidence did not support the ALJ's

21

determination that T.I.M. had less-than-marked limitations in the domain of attending and completing tasks, any such error was harmless. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (holding that, although the ALJ made various errors, these errors were harmless because they ultimately were irrelevant to the denial of the claimant's application for disability benefits). Even if T.I.M.'s limitations in this domain were marked, he still would not be disabled because he did not have marked limitations in at least one additional domain. *See Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(d). Although a minor claimant is disabled if he has extreme limitations in only one domain, the evidence described above demonstrates that T.I.M.'s limitations in the domain of attending and completing tasks were not extreme. *See Shinn*, 391 F.3d at 1279; 20 C.F.R. § 416.926a(d). Accordingly, even if the ALJ erred in evaluating T.I.M.'s limitations in this domain, substantial evidence still would support his ultimate determination that T.I.M. was not disabled.

**AFFIRMED.**