[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-15001
Non-Argument Calendar
_____

D.C. Docket No. 6:11-cv-01154-JBT

MARK C. LUTERMAN,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 2, 2013)

Before TJOFLAT, HULL and PRYOR, Circuit Judges.

PER CURIAM:

Mark Luterman appeals the magistrate judge's order affirming the administrative law judge's ("ALJ") denial of his applications for disability insurance benefits, 42 U.S.C. § 405(g), and supplemental security income, 42 U.S.C. § 1383(c)(3). After review, we affirm.

## I.  FACTUAL BACKGROUND

In 2007, Luterman applied for benefits, alleging that he was disabled due to neck and shoulder pain related to a work injury, degenerative disc disease, bipolar disorder with psychotic features, and intermittent explosive disorder. After Luterman's application was denied, he requested a hearing before an ALJ. After that hearing, the ALJ denied benefits, too. Because Luterman challenges the ALJ's residual functional capacity ("RFC") finding, we review both the medical records and the testimony at the hearing.

### A.    Medical Evidence

Luterman's medical records indicate that he suffers from degenerative disc disease, left shoulder tendonitis, knee effusion (water on the knee), diabetes mellitus (an inability to use glucose normally), hypertension, and obesity. Because the issues on appeal relate to the ALJ's handling of Luterman's mental limitations, however, we review only the evidence relating to Luterman's mental impairments.

In April 2007, Luterman began receiving outpatient mental health treatment at Lakeside Behavioral Healthcare ("Lakeside"). Luterman was seen by Linda

2

Yankovic, a nurse practitioner at Lakeside.  Yankovic performed a psychiatric evaluation and diagnosed Luterman as having bipolar I disorder, severe with psychotic features.  Yankovic's exam notes indicate that Luterman, inter alia, had poor attention span and concentration, had bad judgment, appeared anxious and restless, reported feeling depressed and having mood swings, and was withdrawn and isolated.  At a May 2007 evaluation, Yankovic diagnosed intermittent explosive disorder, which is characterized by repeated episodes of impulsive, aggressive, violent behavior or verbal outbursts that are grossly out of proportion to the situation.  Yankovic prescribed Depakote to decrease Luterman's rage behavior and Risperdal to decrease his paranoia and visual hallucinations.

Nurse Yankovic saw Luterman on follow-up visits about every three months.  According to Yankovic's treatment notes, in May 2007, Luterman's memory was intact, but he had some difficulty concentrating and his insight, judgment and impulse control were impaired.  In July 2007, Yankovic rated his memory and concentration as fair, but his insight and judgment as poor.  Yankovic noted that Luterman was irritable and paranoid and increased his Depakote dosage.  In October 2007, Luterman reported that he felt better, and Yankovic rated his memory, concentration, insight, and judgment as fair.  In January and April 2008, Yankovic again rated Luterman's memory, concentration, insight, and judgment as fair.  In July 2008, Luterman saw Yankovic and reported that he was sleeping

3

better, but was frustrated about money.  Yankovic noted that Luterman's memory, concentration, insight, and judgment were fair and his condition was stable.  In October 2008 and May, August and November 2009, Yankovic indicated there were no changes in Luterman's memory, concentration, insight, or judgment, and Luterman remained stable.

For each visit, Nurse Yankovic also noted a global assessment of functioning ("GAF") score.  Mental health professionals use GAF scores to rate a patient's social, occupational and psychological functioning.  Most of Yankovic's treatment notes contain a GAF score of 40 or 50, indicating serious impairment.

In December 2007, a consulting psychologist, Dr. Deborah Carter, completed a psychiatric review technique after reviewing Luterman's medical records.  Dr. Carter noted that Luterman had: (1) affective disorders, including disturbance of mood and severe bipolar disorder with psychotic effects and manic and depressive syndromes; and (2) inflexible and maladaptive personality traits and intermittent explosive disorder.  Dr. Carter indicated that Luterman had mild limitations in his activities of daily living and moderate limitations in his social functioning and concentration, persistence, and pace.  Dr. Carter noted that Luterman's treatment notes indicated some improvement and that he was capable of performing simple, repetitive tasks with limited social contacts.

Dr. Carter also completed a mental residual functional capacity ("RFC") assessment which noted, inter alia, that Luterman: (1) had no significant memory limitations; (2) had no limitations with short, simple instructions, detailed instructions, or working within a scheduled ordinary routine; (3) had moderate limitations maintaining attention and concentration for extended periods, working with others, completing work without interruptions, performing at a consistent pace without rest periods, interacting appropriately with the public, accepting instructions and criticism, getting along with coworkers, and maintaining socially appropriate behavior; (4) was able to understand, remember, and carry out routine instructions, and concentrate to complete tasks he started; (5) appeared capable of functioning in settings that required minimal social interaction; (6) retained the capacity to function mentally and socially in order to perform his activities of daily living and to interact acceptably with others.

In May 2008, Dr. David Fleischmann, a psychologist, performed a consultative clinical evaluation and mental status examination. Dr. Fleischmann noted that Luterman had received sporadic treatment since 1993 for intermittent explosive disorder and bipolar disorder. Among other things, Luterman "was often non-compliant with his medication, resulting in exacerbations of quick ill-temperament, irritability, oversensitivity and consequent frequent conflicts." As a result, Luterman was often fired for his behavior, such as cursing at supervisors or

coworkers.  Luterman also had been charged with several felonies, including assaults.  Luterman reported having haunting thoughts, including auditory and visual hallucinations, and was prone to sleepwalking, during which he would become aggressive and destructive.

Dr. Fleischmann stated that Luterman was on numerous medications, some of which might have side effects that exacerbated his behavioral and emotional instability.  Luterman admitted overusing his pain medications and narcotics to the point that Luterman believed they were no longer effective.  Dr. Fleischmann indicated that Luterman lived independently and was capable of managing his own personal and financial affairs, such as caring for himself, cooking simple meals, driving, and conversing with neighbors.  Luterman described himself as a "loner" who had learned to stay away from others to avoid conflicts.  As to Luterman's mental status, Dr. Fleischmann noted that Luterman had a good memory and thought and spoke logically, but that he had anti-establishment attitudes and threatened to engage in antisocial behavior, such as theft, if he did not get what he needed.

Dr. Fleishmann diagnosed Luterman with intermittent explosive disorder, opioid dependence, chronic adjustment disorder with physical complaints and mixed emotional features, and personality disorder, not otherwise specified (anti-

6

social and narcissistic traits).  Dr. Fleishmann also noted that Luterman's physical impairments contributed to his chronic adjustment difficulties and irritability.

In June 2008, another consulting psychologist, Dr. Lee Coleman, reviewed Luterman's medical records and completed a psychiatric review technique.  Dr. Coleman noted Luterman's bipolar disorder and Dr. Fleishmann's May 2008 diagnoses of personality disorder and intermittent explosive disorder and opioid dependence due to prescription drug abuse.  Dr. Coleman indicated that Luterman's personality disorders caused: (1) pathologically inappropriate suspiciousness or hostility; (2) persistent disturbances of mood and affect; (3) pathological dependence, passivity, or aggressivity; and (4) anti-social and narcissistic traits.  Dr. Coleman determined that Luterman: (1) had no limitations in his activities of daily living; and (2) had moderate limitations in social functioning and concentration, persistence, and pace.  In addition, Dr. Coleman noted that although Luterman claimed he could not follow written or spoken instructions well, he had completed his activities of daily living form well and had followed Dr. Fleischmann's verbal instructions during the consulting examination.

Dr. Coleman completed a mental RFC assessment, noting in relevant part that Luterman: (1) had moderate limitations in remembering and carrying out instructions, maintaining concentration for extended periods, working with others, accepting instructions and criticism, and getting along with co-workers; (2) was

7

able to understand, retain, and perform simple one-step tasks and instructions; and (3) could work in a non-production work environment that had few coworkers, limited public contact, and routine breaks.

## B.    Administrative Hearing

At a January 2010 hearing, Luterman testified about, inter alia, his mental disorders and their symptoms.  Luterman reported that he would become "mentally weak," and unable to do tasks, and he would then become frustrated and throw fits. Luterman said he took tranquilizing medications that helped him control his anger and made his sleepwalking and nightmares "more mild."  However, his medications also made him feel sick and groggy, requiring him to nap during the day and disrupting his sleep at night.

Dr. Richard Smith, a vocational expert, also testified.  Among several hypotheticals the ALJ posed to Dr. Smith, the ALJ asked whether there were jobs available for a person who could do only light work, could lift twenty pounds occasionally and ten pounds frequently, but could not lift his left arm above the shoulder level, and had no interaction with the general public, no more than five or ten coworkers, and only indirect supervision.  Dr. Smith indicated that there were jobs that person could do, such as small parts assembly in the electronics industry that were "one and two step operations."  The ALJ asked that the jobs be limited to

unskilled positions.  Dr. Smith responded that these were all unskilled jobs and added construction flagger and cleaner or housekeeper.

The ALJ then inquired about sedentary jobs with the same restrictions but that involved sitting most of the day, lifting five pounds frequently and ten pounds occasionally.  Dr. Smith testified that there were small assembly operations, such as eyeglass assembly, fishing reel assembly or toy and sport equipment assembly, such as stuffer or golf ball trimmer, stamper, or inspector.  Dr. Smith clarified that these were jobs that were not done on a conveyor belt and would allow the person to stand intermittently as long as he did not leave his work station.  Dr. Smith indicated that there would be no jobs available if the person "was going to be off task" twenty percent of the time because of drowsiness from medication.

In response to Luterman's questions, Dr. Smith stated that most jobs required more than one step, but not more than two, and that about half of the electronic assembly jobs were "simple one step jobs."  Dr. Smith clarified that some of the assembly jobs, although not on a conveyor belt, were production-type jobs.  However, the time limit on production was very liberal because these jobs were more concerned about errors than speed.  Luterman asked whether there would be jobs available if the person was limited to simple one step tasks in a nonproduction work setting with a few familiar coworkers.  Dr. Smith stated that there were no such jobs available.

9

**C.    ALJ's Decision**

The ALJ denied Luterman's applications for disability benefits, finding that Luterman: (1) had not engaged in substantial gainful activity since October 9, 2006; (2) had the severe impairments of degenerative disc disease, left shoulder tendonitis, knee effusion, diabetes mellitus, hypertension, intermittent explosive disorder, personality disorder NOS (not otherwise specified), and obesity; (3) did not have an impairment or combination of impairments that met or equaled a listed impairment; (4) had the RFC to perform light work "except the claimant is only able to perform unskilled work involving no interaction with the public, no crowds and only indirect supervision," and "would also need to be able to alternate between sitting and standing every 60 minutes and he cannot raise his left arm above his shoulder"; and (5) was unable to perform his past relevant work as a truck driver, but, considering his age, education, work experience, and RFC, could perform jobs that exist in significant numbers in the national economy.

With respect to Luterman's RFC (step 4 noted above), the ALJ stated that she had considered Luterman's symptoms to the extent they were reasonably consistent with the evidence.  The ALJ found that the impairments could reasonably cause the alleged symptoms.  However, Luterman's statements as to the intensity, persistence, and limiting effects of his symptoms were not credible to the extent they were inconsistent with the RFC.

10

After reviewing Luterman's mental health treatment history, the ALJ stated that Luterman had "not generally received the type of medical treatment one would expect for a totally disabled individual."  Among other things, the ALJ noted that: (1) Dr. Fleischmann reported in May 2008 that Luterman was noncompliant with his medications, although treatment notes from the same period stated that Luterman was compliant; (2) in September 2009, Luterman was not taking any psychiatric medication and yet treatment notes indicated his insight, judgment, and memory were intact, he was oriented, and he had no depression, anxiety or agitation; (3) Luterman's treatment history had significant gaps, including one from October 2008 to May 2009; (4) Luterman's medications had been relatively effective in controlling his symptoms; (5) medical records did not corroborate Luterman's claims that his medications made him drowsy and dizzy; and (6) although Luterman had received mental health treatment as early as 1993, he had worked until 2006 (including for one employer for three years), which suggested Luterman's mental impairments did not prevent him from working.

The ALJ acknowledged the proffered GAF scores in Nurse Yankovic's treatment notes, but stated that GAF scores had "dubious applicability to the claimant's *social* and *occupational* functioning" because they were "a subjective clinical impression of the claimant's *overall* functioning."  In addition, the Social Security Commission had declined to endorse the use of GAF scores in social

11

security disability programs because they have no direct correlation to the severity requirements of the mental disorders listings.  See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000).

As for the medical opinion evidence, the ALJ noted: (1) Dr. Carter found that Luterman could understand, remember and carry out routine instructions; could make routine decisions and concentrate to complete tasks; could function mentally and socially to perform his activities of daily living, and could interact acceptably with others; and (2) Dr. Coleman found that Luterman could understand and perform simple one-step tasks, perform simple repetitive tasks in a non-production environment, interact with coworkers and supervisors, and respond appropriately to direct, nonconfrontational feedback and supervision, but should have limited public contact and be provided routine breaks.  The ALJ gave significant weight to Drs. Carter and Coleman to the extent their opinions were consistent with the RFC.[1]  The ALJ found that Luterman's alleged limitations were

---

[1]The ALJ also considered a July 2008 form letter signed by Nurse Yankovic that stated Luterman was "unable to work due to mental health illness." A handwritten notation stated that Luterman was "unable to work due to back pain & when under stress I yell and break things." The ALJ concluded that, as a nurse practitioner, Yankovic was not an acceptable medical source under the Social Security regulations.  See 20 C.F.R. §§ 404.1513, 416.913(a) (excluding nurse practitioner from list of acceptable sources that can establish the existence of an impairment). The ALJ alternatively concluded that Nurse Yankovic's opinion was conclusory and appeared "to rest at least in part on an assessment of an impairment outside [her] area of expertise (the claimant's back impairment)."  The ALJ's treatment of Nurse Yankovic's opinion in the form letter is not at issue on appeal.

more restrictive than those supported by the objective medical evidence and that the exertional and nonexertional limitations in the ALJ's RFC finding were consistent with the objective medical evidence.

In considering what work Luterman could perform (step 5 noted above), the ALJ found that, given Luterman's RFC, he could not perform his past relevant work or a full range of light work. However, the vocational expert had testified that a person with Luterman's RFC could perform a number of light jobs, including small parts assembler, construction flagger, and hotel cleaner, and sedentary jobs, including assembly worker, fishing reel assembler, stuffer in the toy industry, or golf ball trimmer or inspector. The ALJ noted that Luterman had asked the vocational expert about jobs available to someone who was limited to one step tasks in a nonproduction setting with few people around and that the vocational expert had responded that there were no jobs available under those conditions. The ALJ found, however, "no persuasive support in the claimant's treatment records to indicate he is limited to this extent."

Based on the vocational expert's testimony, the ALJ concluded that Luterman was not disabled. The Appeals Council denied review of the ALJ's decision, making it the final decision of the Commissioner. See Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001). On judicial review, the magistrate judge

13

entered an order affirming the Commissioner's decision.[2]  Luterman filed this appeal.

## II.  DISCUSSION

### A.    Five-Step Evaluation

Under the five-step sequential evaluation used to determine whether a claimant is disabled, the ALJ considers: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether the severe impairment meets or equals an impairment listed in the Listing of Impairments; (4) if not, whether the claimant has the RFC to perform his past relevant work; and (5) if not, whether, in light of the claimant's age, education, and work experience, the claimant can perform other work that exists in significant numbers in the national economy.  See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The claimant bears the burden to prove the first four steps.  If the claimant does so, the burden shifts to the Commissioner to prove the fifth step.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999).

### B.    Luterman's Claims

On appeal, Luterman argues that the ALJ erred (1) at the fourth step by failing to include Dr. Coleman's one-step tasks and nonproduction work setting

_____

[2]The parties consented to proceeding before the magistrate judge.

limitations into the RFC ,and (2) at the fifth step by relying on vocational expert testimony in response to a hypothetical question that omitted those same limitations.[3]

RFC is a medical assessment of what the claimant can do in a work setting despite any mental, physical, or environmental limitations caused by the claimant's impairments or related symptoms. 20 C.F.R. §§ 404.1545(a), 416.945(a). RFC includes mental abilities, such as the ability to understand, remember, and carry out instructions or respond appropriately to supervision, coworkers, and work pressure. Id. §§ 404.1545(c), 416.945(c). The RFC is based on all the relevant evidence in the record, including any medical evidence, and is used in steps four and five of the evaluation process to determine what work the claimant can do. Id. §§ 404.1545(a)(1), (5), 416.945(a)(1), (5); see also Phillips v. Barnhart, 357 F.3d 1232, 1238 (11th Cir. 2004).

In assessing the claimant's RFC, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987). The ALJ also must consider any findings of a state agency medical or psychological consultant, who is considered

---

[3]Our review is limited to whether the ALJ's decision is supported by substantial evidence and based on the proper legal standards. Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. (quotation marks omitted). Under this limited standard, we may not make findings of fact, reweigh the evidence or substitute our judgment for that of the Commissioner. Id.

an expert, and must assign weight and give explanations for assigning weight the same way as with any other medical source.  See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); SSR 96-6p, 1996 WL 374180 (Jul. 2, 1996).  In determining how much weight to give a medical opinion, the ALJ considers factors such as the examining or treating relationship, whether the opinion is well-supported, whether the opinion is consistent with the record, and the doctor's specialization.  See 20 C.F.R. §§ 404.1527(c), 416.927(c).

At the fifth step, the ALJ must determine whether a significant number of jobs exist in the national economy that the claimant can perform given his RFC. Where, as here, there are nonexertional limitations, the ALJ "must introduce independent evidence, preferably through a vocational expert's testimony," of the existence of such jobs.  Wolfe v. Chater, 86 F.3d 1072, 1077-78 (11th Cir. 1996). For the vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question that comprises all of the claimant's impairments. Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011). However, the ALJ need not include "each and every symptom" of the claimant's impairments, Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1270 (11th Cir. 2007), or medical "findings . . . that the ALJ had properly rejected as unsupported." Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004).

Here, the ALJ's RFC determination at step four was supported by substantial evidence.  The ALJ stated that she gave significant weight to Drs. Carter and Coleman's opinions, both of whom found moderate limitations in Luterman's social functioning and his concentration, persistence, and pace.  Drs. Carter and Coleman agreed, however, that Luterman could follow short, simple instructions and needed a work environment with minimal public interaction and few coworkers.  Thus, the ALJ adequately explained the weight she assigned to these opinions.

Luterman complains that Dr. Coleman's mental RFC assessment limited Luterman to one-step tasks and a nonproduction work setting, which the ALJ did not include in her RFC finding.  However, the ALJ explained that these additional limitations were not supported by Luterman's treatment record.  The ALJ's reason for excluding Dr. Coleman's additional limitations is supported by substantial evidence.  After Dr. Coleman's June 2008 evaluation, Lakeside treatment notes consistently observed that Luterman's concentration, insight, and judgment were fair and that his condition was stable.  Further, treatment notes for Luterman's physical impairments indicate that between September and December 2009, Luterman was not taking mental health medications, yet his judgment, insight, and memory were all intact.

17

Luterman also contends that the ALJ should have considered the GAF scores in Yankovic's treatment notes and determined what weight to give them. In fact, the ALJ did explicitly consider the GAF scores, but discounted them because they provided only a subjective clinical impression of Luterman's overall functioning, rather than his occupational functioning, and because the Commissioner does not endorse use of the GAF scale for disability purposes. Substantial evidence supports the ALJ's conclusion that Luterman could perform unskilled work with indirect supervision and no public interaction or crowds.

Because the medical evidence indicated that, despite moderate limitations in social functioning and concentration, persistence, and pace, Luterman could perform simple, one and two step tasks in a work setting with minimal social interaction and no public contact, the ALJ's hypothetical question sufficiently accounted for Luterman's mental impairments. See Winschel, 631 F.3d at 1180. The ALJ was not required to include in the hypothetical question Dr. Coleman's additional limitations that the ALJ found were not supported by the record. See Crawford, 363 F.3d at 1161. Accordingly, the vocational expert's testimony is substantial evidence supporting the ALJ's decision that Luterman could perform a significant number of jobs in the national economy, and was not disabled.

**AFFIRMED.**