[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-14138

_____

D.C. Docket No. 5:16-cv-00328-LJA-CHW

MELISSA STOREY,

Plaintiff-Appellant,

versus

NANCY A. BERRYHILL,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 13, 2019)

Before WILLIAM PRYOR and ROSENBAUM, Circuit Judges, and CONWAY,*

District Judge.

_____

*Honorable Anne C. Conway, United States District Judge for the Middle District of Florida,
sitting by designation.

PER CURIAM:

Melissa Storey appeals the district court's order affirming the Commissioner of the Social Security Administration's (the "Commissioner") denial of a period of disability and disability-insurance benefits, pursuant to 42 U.S.C. § 405(g). On appeal, Storey asserts the Administrative Law Judge (ALJ) erred by finding that she had the residual functional capacity ("RFC") to perform light work, including her past relevant work, and in discounting the opinions of her treating physicians.

## I. BACKGROUND

Storey alleges disability as of March 10, 2014, based on a combination of physical impairments, including stage II endometrial cancer, arthritis in the right hip, back pain, high blood pressure, and diabetes.[1] She was 53 years old at the alleged onset date and had turned 55 years old by the time of the ALJ's hearing in November 2015. Storey is a high-school graduate and has past work experience as a hotel manager, secretary, receptionist, office manager, and a patient coordinator.

*A. Medical Records and Opinion Evidence*

Storey's medical records reflect that she was diagnosed with stage II endometrial cancer in March 2014. She had a hysterectomy and her lymph

---

[1] Storey also alleged the mental impairments of depression and anxiety, but her physical impairments are the sole focus of this appeal.

2

nodes removed, followed by radiation and chemotherapy through April 2014.

Towards the end of her cancer treatment, Storey complained to the oncologist that she was having intense pain in her right hip and lower back. The oncologist ordered a magnetic-resonance-imaging scan ("MRI") of Storey's right hip to determine whether the cancer had spread to her pelvis or hip. While the MRI did not show her cancer had spread, the MRI did show inflammation, an exacerbation of chronic sciatica, bursitis, and "significant arthritic changes" compatible with osteoarthritis in her right hip.

The oncologist referred Storey to an orthopedic surgeon, Dr. Reid, who began treating her on May 7, 2014 for hip pain. According to Dr. Reid's diagnosis, the cause was bursitis in the right hip and localized primary osteoarthritis of the pelvic region and thigh, with low-back pain. Dr. Reid prescribed a cane for her at that time. On June 10, 2014, in response to Storey's continuing complaints of hip pain on the right side, Dr. Reid noted on examination tenderness in the greater trochanter and hip flexor muscle, reduced range of motion, and positive Ober's test[2]; he reiterated his diagnosis of Storey's hip pain. In his physical examination of Storey's lower back, he noted decreased lordosis, tenderness of the paraspinals on the right at L4, and

_____

[2] Ober's Test is commonly used in orthopedic examinations of the hip to test for tightness in the Tensor Fascia Lata or contractures in the iliotibial band that limit hip adduction. https://physicaltherapyweb.com/obers-test-orthopedic-examination-of-the-hip/ (visited on May 22, 2019).

positive straight leg raising tests in supine and seated positions, with tenderness of the iliolumbar region and reduced range of motion; Dr. Reid added the diagnosis of acute sciatica and lumbago. He referred Storey for physical therapy and prescribed lumbar stretching exercises, pain medications, and supportive back brace. He also specifically advised Storey to avoid prolonged sitting and elevate her foot if sitting in one position for a long time. And he included generic instructions for "the patient" to follow a low glycemic diet so "they" could reduce joint inflammation and lose weight; these general instructions are included at the end of each set of treatment notes. Dr. Reid determined that Storey displayed "no evidence of surgical indications with respect to the presenting spinal pain" at that point, but he ordered an MRI of her lumbar spine.

The June 23, 2014 MRI of Storey's spine showed mild multilevel degenerative disc disease,[3] with the addition of a Grade 1 anterolisthesis of about 3 mm and mild to moderate spinal canal narrowing causing impingement of the right L4, left S1, and left L5 nerve roots. At Storey's appointment on June 30, 2014, Dr. Reid continued to note tenderness in her hip flexors, limited range of motion, and positive results on Ober's test and straight leg raising test. Dr. Reid interpreted the spine MRI as showing L4-5 "hnp" or herniation of

---

[3] At T12-L1, L2-L3 and L3-L4, the findings were "mild" and, at L1-L2, they were unremarkable.

the nucleus pulposus,[4] listhesis,[5] and foramen stenosis on the right. With the benefit of the spine MRI, Dr. Reid changed Storey's diagnosis to degeneration of lumbar intervertebral disc, spinal stenosis of lumbar region, and low back pain in addition to the acute sciatica and bursitis he had previously diagnosed. He prescribed pain medications and an anti-inflammatory and gave Storey a referral to pain-management specialists.

In December 2014, in her request for the state disability agency to reconsider its initial administrative denial of her application for disability benefits, Storey was asked to describe how her condition had changed since the Social Security Administration's ("SSA") initial decision. Storey explained that, beginning in Spring 2014, she had severe right hip pain which went into her groin area and down the leg, and the doctors could not pin down the problem even though she had undergone MRIs. She could not sit or stand for long periods of time and she now had to use a cane and walked with a limp. She described the MRIs as showing a bulging disk and severe inflammation in her hip joint and down the sciatic nerve.

---

[4] Herniated nucleus pulposus is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disk is forced through a weakened part of the disk, resulting in back pain and nerve root irritation. https://medlineplus.gov/ency/imagepages/9700.htm (visited on May 22, 2019).

[5] Spondylolisthesis is a condition in which one of the bones of the spine (vertebrae) slips out of place onto the vertebra below it. If it slips too much, the bone might press on a nerve, causing pain. https://my.clevelandclinic.org/health/diseases/10302-spondylolisthesis (visited on May 22, 2019).

As part of the reconsideration process, the state agency medical consultant, Dr. Cochran, reviewed Storey's medical records on February 20, 2015 and opined, based on the medical records he reviewed from June and July 2014, that Storey could perform light work which required lifting 20 pounds occasionally and 10 pounds frequently and could stand, walk, and sit for six hours each in an eight-hour workday.[6] Dr. Cochran concluded that no medically determinable impairment limited Storey to lifting no more than ten pounds, limiting her time sitting to five minutes at a time and sit/stand/walk for less than two hours total in the workday as Dr. Powell, her primary care physician, had opined in his treating-source statement. In Dr. Cochran's opinion, Storey had not been prescribed the cane "longitudinally" and did not need one to ambulate.

Dr. Reid referred Storey to another orthopedic surgeon—a "spine surgeon," named Dr. Kelley—to determine whether Storey should have surgery on her lumbar spine for spinal stenosis. Dr. Kelley noted Storey's hip pain was her number-one complaint, along with buttock pain that radiated to the groin accompanied by a burning sensation and pain in her calf which radiated down her leg and led to numbness in her toes, but the MRIs also

_____

[6] Dr. Cochran also opined that Storey could frequently climb ramps and stairs, stoop, kneel, crouch, and crawl, and she could occasionally climb ladders, ropes, and scaffolds.

6

showed right foraminal stenosis at L4-L5 and left frontal stenosis at L5-S1.[7]

Dr. Kelley found on examination Storey had reduced motor strength in her right hip and diminished ankle reflexes, and he diagnosed Storey with lumbar stenosis, lumbosacral spondylosis with radiculopathy, and L4-L5 spondylolisthesis. Dr. Kelley recommended that Storey proceed with her hip replacement first, and once she recovered from that surgery, follow up for further treatment of the lumbar spine. In the meantime, he advised her to continue using the back brace Dr. Reid had prescribed.

In February 2015, Dr. Reid also recommended a total hip replacement because he estimated that Storey had a permanent partial impairment[8] due to the arthritis and bursitis in her hip, but she could reduce the permanent impairment "if she proceeded with total hip replacement." However, as the ALJ noted, Storey testified at the hearing that she had been told "because of her age, the hip replacement would not work."

In July 2014, Storey also received treatment from physicians at Pain Management Specialists, on referral from Dr. Reid, for treatment of the pain in her lower back. Storey subsequently told Dr. Reid that the steroid injection to

---

[7] Dr. Kelley specifically assessed Storey with spinal stenosis of lumbar region, spondylolisthesis, degenerative spondylolisthesis, and spondylolisthesis, grade 1 based on his review of the MRI.
[8] When an injured employee has reached maximum medical improvement, a physician will often provide a rating of permanent partial impairment ("PPI"), a medically based determination of physical functioning. *See*, *e.g.,* https://www.dol.gov/owcp/dlhwc/contacts/jac/6lsrb.htm (visited May 13, 2019).

her lower back made her back pain worse. In January 2015, Dr. Leggett from the pain management practice also diagnosed Storey with arthritis in her hip joint and lumbar spondylosis based on a November 2014 MRI which showed moderate narrowing of the joint space with irregularity of contour of the femoral head with marginal osteophytes, compatible with degenerative changes in the right hip. His practice group continued to provide pain management through May 2015, and although the physicians—or at one appointment, the physician's assistant[9]—examined Storey, their exams were not as thorough as those of the two orthopedic surgeons. At the May 2015 appointment, there was no physical examination of Storey's lumbar spine conducted by the physician's assistant, even though Storey continued to be treated for the pain in her lower back and hip.

Dr. Reid completed a medical-source statement of ability to do work-related activities on February 11, 2015. He determined that Storey had limitations that would essentially preclude her from full-time work:[10] she had to avoid prolonged sitting of more than one hour at a time, could stand no more

---

[9] Physician's Assistant Ogletree performed the examination on May 22, 2015; the record was not signed until five days later by the supervising physician. The ALJ repeatedly relied on the treatment notes which opined Storey's gait was normal"; however, the same notes reflect that the range of motion in her hips was "restricted with abduction, internal rotation, and external rotation," and she received an intra-articular hip injection and an increase in the prescription for pain medications at that visit.

[10] The opinion of Dr. Powell was based on Dr. Reid's diagnosis of Storey as having severe arthritis, trouble with weight-bearing activity, and requiring a cane for walking.

than 15 minutes at one time, elevate her foot, and rest laying down twice per workday, and take four breaks per day. Dr. Reid's Medical Source Statement was not submitted until March 23, 2015 and thus was not in Storey's file when Dr. Cochran reviewed the medical records on February 20, 2015.

Records dated June 30, 2014 to February 26, 2015 from Dr. Reid's office—which contained Dr. Kelley's February 26, 2015 notes diagnosing spine impairments but recommending Storey have hip surgery before treatment of her lumbar problems—were sent to SSA on November 2, 2015. These records were timely sent prior to the ALJ's November 20, 2015 hearing and two months before the ALJ issued his unfavorable decision on January 12, 2016. However, Dr. Kelley's records were not discussed in the ALJ's decision.

*B. The Unfavorable Decision of the ALJ*

In January 2016, the ALJ issued an unfavorable decision finding Storey not disabled. The ALJ determined that Storey was able to perform work at the light exertional level except insofar as she was limited to occasional stooping, kneeling, crouching, crawling, and climbing stairs, and she could never climb ladders, ropes or scaffolds, or work near vibrations and hazards. The ALJ opined that Storey would have to be permitted to use a cane to ambulate to and from her workstation. Relying on the testimony of a vocational expert, the ALJ determined that Storey was able to perform her past relevant work as a hotel

clerk, hospital admitting clerk, insurance clerk, and receptionist, all of which are at the light or sedentary exertional level.

In reaching the conclusion that Storey was capable of performing light work, the ALJ reviewed the medical evidence and found that, although the evidence was consistent with Storey's diagnosed orthopedic conditions— multilevel degenerative disc disease of the lumbar spine with associated disc bulging, spondylosis of the thoracic spine, sciatica, osteoarthritis and bursitis in the right hip—the objective findings were "mild" or "normal," and the prescribed treatment was "routine and conservative."

The ALJ rejected Storey's testimony that her hip and lumbar problems progressively worsened, and, as a result, she required a cane for walking, with limitations in sitting, standing, walking and lifting. The ALJ found that the MRI of Storey's right hip, which revealed degenerative changes, showed "a small joint effusion, but there was no focal suspicious mass lesion, fracture, or osteonecrosis." Storey's MRI of the lumbar spine, the ALJ found, showed "only mild" multilevel degenerative disc disease, her straight leg raising tests were negative, and there was no clonus of the ankle or knee. The ALJ further found that the diagnosed arthritis in her right hip did not confirm that a cane was medically necessary, but "even if it is," he opined, "the medical evidence of record [did] not show that she has a case of hip arthritis or bursitis that

10

requires surgical intervention." The ALJ believed that Storey's hip bursitis was "the main issue" but the medical records "suggested" Storey's hip impairments "would improve with weight loss."

The ALJ gave "little weight" to the opinions of Dr. Powell and Dr. Reid because he found both of their opinions were conclusory, provided "very little explanation of the evidence relied on," and failed to "reveal the type of significant clinical and laboratory abnormalities one would expect if [Storey] were in fact disabled." The ALJ also found that Dr. Reid's opinion of Storey's limitations from her hip and lower back impairments was "vague" and "lacking the specificity which might otherwise make it more convincing." The ALJ listed multiple "normal" or negative findings from Dr. Reid's physical examination notes, such as axial alignment pelvis level, heel-to-shin coordination, normal ankle and knee reflexes, sensation on both sides, and the absence of a leg-length discrepancy, as well as findings showing a lack of tenderness in the specific muscle areas in the mid and lower back. The ALJ also cited Dr. Powell's reports of normal reflexes and "some tenderness," but no edema in the musculoskeletal area. And the ALJ cited other treatment notes for all of the symptoms Storey did *not* have, such as the absence of tingling, swelling, redness, warmth, ecchymosis, catching/locking, popping/clicking, buckling, grinding, instability, weight loss, or a change in bowel/bladder

habits.

The ALJ gave "significant weight" to the opinion of the state agency medical consultant, Dr. Cochran, and determined that his opinion that Storey was capable of light work "was reasonably supported." The ALJ did, however, make a point of adding "limitations to accommodate hip issues." Dr. Cochran discounted the medical-source statement from Storey's treating primary care physician, Dr. Powell, that she was limited in sitting, standing, and walking to less than two hours per workday, had to keep her leg elevated 90% of the time in a sedentary job, and would miss more than 4 days per month because of her impairments as "preposterous [o]n its face with claimant clearly not bed-bound for 22/24 hours" and "inconsistent with activities of daily living." In addition, Dr. Cochran found Storey's statements on her application were only "partially credible" because, although her symptoms and limitations were "consistent with a medically determinable impairment," the severity she alleged was inconsistent with objective findings, including her activities of daily living. Dr. Cochran opined that Storey's lumbar spine pain, right-hip pain, and bursitis could be managed with physical therapy, pain medications, exercises, a weight loss diet, and that her lumbar spine MRI results were "mild." He concluded that Storey was able to perform light work on a "sustained basis," based on his review of the available medical records in the file at the time of his review.

12

But Dr. Cochran did not review any of the later records from Dr. Reid or the other specialists to whom Dr. Reid referred Storey for consultation regarding surgery on her lumbar-spine impairment and pain management. Dr. Cochran did not have the benefit of the medical-source statements from Dr. Reid or the records of Dr. Kelley, who recommended that Storey undergo hip-replacement surgery before receiving surgery for her lumbar radiculopathy. Dr. Cochran also did not have access to the records from Storey's treating pain management physicians, which were submitted on November 2, 2015.

Although dysfunction of major joints was listed in the SSA's reconsideration report from Dr. Cochran, he did not conclude that Storey's hip/joint "dysfunction" was a "primary" or "secondary" impairment; instead, he determined that Storey's hip dysfunction was "non-severe."

The ALJ concluded that "the evidence as a whole does not confirm disabling limitations arising from the claimant's underlying medical conditions, nor . . . are [they] of such severity that they could reasonably be expected to give rise to disabling limitations" and would not prevent Storey from performing light work with some non-exertional limitations.

In June 2016, the Appeals Council denied review of the ALJ's decision. The district court affirmed the ALJ's decision. On appeal, Storey argues that the ALJ's finding that she was capable of performing her past relevant work at

13

the light exertional level was not supported by substantial evidence and that the ALJ erred in discounting the opinions of her treating physicians. After careful review, we conclude that the ALJ's decision to deny benefits was not based on substantial evidence. We vacate and remand.

## II. DISCUSSION

In social security appeals, we review the decision of an ALJ to deny benefits as a final decision of the Commissioner of the Social Security Administration when the Appeals Council denies review. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). We review the Commissioner's decision to determine if it is "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (citation and internal quotation marks omitted). We must affirm a decision that is supported by substantial evidence even if the evidence preponderates against the Commissioner's factual findings. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1260 (11th Cir. 2007). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Lewis v. Callahan,* 125 F.3d 1436, 1440 (11th Cir. 1997).

We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner. *Winschel,* 631 F.3d at 1178. But

we review *de novo* whether the Administration applied the correct legal standards. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

Although our review is deferential, "[w]e must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). A decision is not supported by substantial evidence if the ALJ "reached the result that [he] did by focusing upon one aspect of the evidence and ignoring other parts of the record." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). The ALJ must state with at least some measure of clarity the grounds for the decision, and we will not affirm "simply because some rationale might have supported the ALJ's conclusions." *Winschel*, 631 F.3d at 1179 (citation and internal quotation marks omitted).

A claimant must have a disability to be eligible for disability insurance benefits. *See* 42 U.S.C. § 423(a)(1)(E). A claimant is disabled if she is unable to engage in substantial gainful activity by reason of a medically determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. *Id.* § 423(d)(1)(A). The claimant bears the burden of proving his disability and "is responsible for producing evidence in support of his claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).

15

The Social Security Regulations outline a five-step, sequential evaluation process to decide whether a claimant is disabled which requires the ALJ to determine (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel,* 631 F.3d at 1178; *see* 20 C.F.R. § 404.1520(a)(4). A claimant who can perform her past relevant work is not disabled. *See id.* §§ 404.1560(a)(iv), (f) & 404.1560(b)(3).

At step four of the sequential analysis, the ALJ must determine a claimant's RFC by considering "all relevant medical and other evidence in the case." *Phillips v. Barnhart*, 357 F.3d 1232, 1238 (11th Cir. 2004). The RFC is an assessment of a claimant's ability to do work despite her impairments. *Lewis*, 125 F.3d at 1440. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

An ALJ must consider all medical opinions in a claimant's case record, together with other relevant evidence. 20 C.F.R. § 404.1527(b). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including the claimant's symptoms, diagnosis, and prognosis." *Winschel,* 631 F.3d at 1178-79 (20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)). Absent "good cause," an ALJ must give the medical opinions of treating physicians "substantial or considerable weight." *Lewis*, 125 F.3d at 1440; *see also* 20 C.F.R. §§ 404.1527(d)(1)-(2), 416.927(d)(1)-(2). Good cause exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips*, 357 F.3d at 1241. If good cause exists, an ALJ "may disregard a treating physician's opinion, but he 'must clearly articulate [the] reasons' for doing so." *Id.* at 1240–41.

Storey argues that the ALJ lacked good cause to reject the opinions of her treating physicians, but we need not resolve this question because we conclude that the ALJ's determination that Storey has the residual functional capacity to perform her past relevant work was not supported by substantial evidence. After rejecting the opinions of Storey's treating physicians as conclusory and inconsistent with the evidence in the record, the ALJ found that Storey was not disabled by relying

17

principally on the RFC determination of the state-agency medical consultant that Storey could perform light work. But Dr. Cochran did not examine Storey, and as we have explained, "reports of physicians who do not examine the claimant, taken alone, do not constitute substantial evidence on which to base an administrative decision." *Spencer on Behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985); *see also Sharfarz v. Bowen*, 825 F.2d 278, 280 (11th Cir. 1987) ("The opinions of nonexamining, reviewing physicians . . . standing alone do not constitute substantial evidence.").

Dr. Cochran's RFC assessment was also based on only a limited portion of the medical records submitted at the time of his assessment, when there was no opinion or functional assessment by Dr. Reid in the file he reviewed; the only materials from Dr. Reid in the file were his treatment notes from June-July 2014 timeframe and the lumbar spine MRI. As a result, the set of records Dr. Cochran reviewed did not contain Dr. Reid's subsequent finding that Storey required hip replacement surgery and had lumbar spine radiculopathy, or the treatment notes from the second orthopedic surgeon, Dr. Kelley, who concurred in that opinion. Dr. Cochran also did not have Dr. Reid's June 30, 2014 treatment notes with findings of degeneration of lumbar intervertebral disc and spinal stenosis of lumbar region or Dr. Kelley's subsequent diagnosis of lumbar stenosis and

lumbosacral spondylosis with radiculopathy because these records were submitted three weeks before the ALJ's hearing in November 2015.

True, the ALJ also had access to Storey's medical records, which included all of Dr. Reid's, Dr. Kelley's, and the Pain Management Specialists records. But we cannot say that the ALJ properly "[took] into account and evaluate[d] the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986); *see Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987) (holding ALJ erred in not properly considering treating physicians' opinions that claimant with arthritis in knees was limited in ability of standing, walking, climbing, and alternate sitting and standing in whether he could perform "light work").

Despite having all of Storey's medical records, the ALJ mischaracterized the records as showing a history of "routine and conservative" treatment. The ALJ relied on portions of the physical examination notes and diagnostic testing that were not relevant to Storey's orthopedic impairments—such as the oncologist's statements[11] that Storey was "otherwise doing well" or her pain medications were helping

---

[11] The ALJ noted Storey's treatment records from the oncologist's office showed that she had "returned to work 3 weeks ago doing much more lifting and moving than previously" in "August 2014." However, this same "history of present illness" was listed as "per Dr. Wahab," a previous treating radiology oncologist with Dr. Medberry, who had treated Storey's cancer in April 2014 and there were none of those previous notes in the record.

"significantly" with her hip pain. The ALJ also relied on records that did not accurately reflect the more significant results found on Storey's hip and lumbar MRIs, and which failed to recognize Storey's combination of orthopedic impairments that the orthopedic specialists had some difficulty diagnosing and treating due to symptomatic pain interactions in the areas of the hip and the lower back.

The ALJ also mischaracterized Storey's 2014 MRI of her hip as showing "only mild" degenerative changes with a "small joint effusion" without "lesion, fracture, or osteonecrosis," omitting the other hip MRI findings of "significant" arthritic changes. The MRI showed "a small bone island" in the femoral head, a "moderate decrease in the joint space with marginal osteophytes, compatible with osteoarthrosis" and a "small amount of pelvic free fluid." Dr. Reid diagnosed the right hip pain in May-June 2014 as bursitis with localized primary osteoarthritis of the pelvic region and thigh, with low back pain, and he prescribed a cane for her at that point in time.[12] Dr. Reid's examinations of Storey in June 2014 noted tenderness in the greater trochanter and hip flexor muscle, reduced range of motion limited to 30% internally and externally, and positive Ober's test consistent

---

[12] The ALJ found that Storey was using a cane but the "medical evidence of record do not necessarily confirm that a cane is medically 'necessary.'" However, the medical records from Dr. Reid note that he prescribed a cane for Storey in May and June 2014.

with a hip impairment, even though the ALJ cited only categories from these same treatment notes as showing "no muscle aches" and "no arthralgias/joint pain"[13] and categories with "normal" or negative results.

Additionally, because Storey reported "still having right hip pain, [medications] not helping, [injection] last month did not help," Dr. Reid examined her lumbar spine and noted decreased lordosis, tenderness of the paraspinals on the right at L4, and positive straight leg raising tests in supine and seated positions, with tenderness of the iliolumbar region and reduced range of active and passive motion. The ALJ's selective inclusion of only "normal" or negative examination results to support the ALJ's "mild" characterization of her condition was not based on substantial evidence.

The ALJ found Storey had "only mild" degenerative disc disease in her spine and she received "routine, conservative" treatment. But in describing Storey's spine MRI, the ALJ cited only the first line as if it were the summary of the radiologist's much lengthier report. The ALJ did not include the other conclusions—that Storey had a Grade 1 anterolisthesis and mild to moderate spinal canal narrowing which caused impingement of

---

[13] To the extent the ALJ implied Storey did not require an "assistive device" or cane and had no limp, he misunderstood Dr. Reid's notes which said: Storey "ambulated with no assistive devices and limp."

three nerve roots—the right L4, and the left S1 and L5. With the benefit of the spine MRI, showing L4-5 herniation of the nucleus pulposus, listhesis, and foramen stenosis on the right, Dr. Reid diagnosed degeneration of lumbar intervertebral disc, spinal stenosis of lumbar region, and low back pain in addition to the acute sciatica and bursitis he had previously diagnosed. He prescribed the spinal brace, pain medications and an anti-inflammatory, and gave Storey a referral to pain-management specialists. Because Dr. Reid also found spinal stenosis of the lumbar region with neurogenic claudication, he referred Storey to Dr. Kelley, who diagnosed Storey with lumbar radiculopathy, but the ALJ omitted any mention of Dr. Kelley's diagnosis of radiculopathy from his decision.

The ALJ stated that, in his opinion, Storey's hip bursitis was the "main issue," and he found the medical records did not show her right hip impairment "required surgical intervention." But it is generally improper for an ALJ to substitute his own judgment for that of a medical expert because ALJs are not medical experts. *Graham v. Bowen*, 786 F.2d 1113, 1115 (11th Cir. 1986); *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). Moreover, the ALJ's non-medical opinion of Storey's hip impairment was contradicted by the records from Dr. Reid, who recommended to Storey a total hip replacement. Dr. Reid opined Storey's

permanent partial impairment in her hip would be reduced "if she proceeded with total hip replacement."[14] As a result, we conclude that in this circumstance, remand is necessary to permit consideration of the evidence ignored by the ALJ. *See Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) ("Remand for further factual development of the record before the ALJ is appropriate where the record reveals evidentiary gaps which result in unfairness or clear prejudice." (citation and internal quotation marks omitted)).

### III. CONCLUSION

We **VACATE** the ruling of the district court and **REMAND** for further proceedings consistent with this opinion.

---

[14] Storey testified at the ALJ hearing that she could not afford medical treatment and her healthcare deductible was $6,000.